Susan J. Welde (SBN 205401)
ROPERS MAJESKI PC
801 South Figueroa St, Suite 2100
Los Angeles, CA 90017
Telephone:  213.312.2000
Facsimile:  213.312.2001
Email:    susan.welde@ropers.com

Martin W. Jaszczuk (*Pro Hac Vice*)
Margaret Schuchardt (*Pro Hac Vice*)
Akshay Soman (*Pro Hac Vice*)
JASZCZUK P.C.
311 South Wacker Drive, Suite 2150
Chicago, IL  60606
Telephone:  312.442.0509
Email:    mjaszczuk@jaszczuk.com
          mschuchardt@jaszczuk.com
          asoman@jaszczuk.com

Attorneys for Plaintiff
RUBEN VALENZUELA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| RUBEN VALENZUELA, individually and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KING.COM LIMITED and ACTIVISION BLIZZARD, INC.,<br><br>Defendants. | Case No. 2:25-cv-09082-FLA-MAR<br><br>**PLAINTIFF'S STATEMENT PURSUANT TO ORDER TO SHOW CAUSE RE SUBJECT MATTER JURISDICTION** |

Plaintiff Ruben Valenzuela respectfully submits the following statement in response to the Court's Order to Show Cause Why Action Should Not Be Dismissed for Lack of Subject Matter Jurisdiction (Dkt. 14, "OSC").

## I.   <u>INTRODUCTION</u>

In the OSC, the Court ordered the parties to show cause why this action

ROPERS MAJESKI
A Professional Corporation
Los Angeles

should not be dismissed for lack of subject-matter jurisdiction. Specifically, the Court inquired whether the Class Action Fairness Act (28 U.S.C. § 1332(d), "CAFA") amount in controversy requirement ("AIC") was met. (OSC, p. 3.) Plaintiff's Complaint seeks remedies on behalf of a class of California consumers pursuant to, *inter alia*, the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA").  The remedies Plaintiff seeks include compensatory damages (*e.g.*, refunds of in-app purchases), punitive damages, and attorneys' fees. (Compl., ¶¶ 114–147 and pp. 32-33.)

CAFA provides federal subject matter jurisdiction if the following conditions are met: (i) the proposed class is at least 100 members; (ii) minimal diversity in which at least one member of the class is a citizen of a state and any defendant is a citizen or subject of a foreign state; and (iii) the amount in controversy exceeds $5,000,000. *See* 28 U.S.C. § 1332(d)(2)(C), (d)(5)(B).  These requirements have all been met here.

1.  **Class Size**: The proposed California class includes well over 100 members. (Compl., ¶¶ 105–110.)

2.  **Minimal Diversity**: Plaintiff is a California citizen while at least one Defendant is diverse. Specifically, Defendant King.com Limited ("King") is a Malta corporation with its principal place of business in St. Julian's, Malta. (Compl., ¶ 19.)

3.  **Amount in Controversy**: As set forth below, using reasonable assumptions tethered to the Complaint and the public record, the aggregate AIC far exceeds $5 million, exclusive of interest and costs, even using conservative estimates. The Ninth Circuit permits such reasonable, complaint-based assumptions at this stage. *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 925–27 (9th Cir. 2019); *Ibarra v. Manheim*, 775 F.3d 1193, 1197–99 (9th Cir. 2015) ("…a damages assessment may require a chain of reasoning that

ROPERS MAJESKI

A Professional Corporation
Los Angeles

includes assumptions. When that is so, those assumptions cannot be pulled from thin air but need some reasonable ground underlying them."); *Perez v. Rose Hills Co.*, 131 F.4th 804, 808 (9th Cir. 2025) ("While those assumptions cannot be pulled from thin air, they can be founded on the allegations of the complaint and do not necessarily need to be supported by evidence.") (internal quotations and citations omitted).

Accordingly, the OSC should be discharged.

## II.    LEGAL STANDARD UNDER CAFA

CAFA confers original jurisdiction where: (1) the class has at least 100 members; (2) minimal diversity exists; and (3) the aggregate AIC exceeds $5,000,000. 28 U.S.C. § 1332(d)(2), (5), (6); *see Perez*, 131 F.4th at 807. When the amount is questioned, the proponent must show, by a preponderance of the evidence, that the threshold is met using reasonable assumptions grounded in the complaint. *Arias*, 936 F.4th at 924–25; *Ibarra*, 775 F.3d at 1198; *Perez*, 131 F.4th at 806.

## III.    RELEVANT FACTUAL BACKGROUND

The Complaint alleges that the Candy Crush All Stars 2023 Tournament (the "Tournament") was administered in a fraudulent and deceptive manner, causing California players, including Plaintiff, to make in-app purchases they would not have made had they been aware of their true standing in the Tournament. On behalf of a California-wide class, Plaintiff seeks compensatory damages (*e.g.,* refunds of the in-app purchases), punitive damages, and attorneys' fees under the CLRA. (Compl., ¶¶ 114–133, pp. 32-33.)

A press release from Defendant Activision Blizzard, Inc. ("Activision") indicates that roughly 20 million players participated in the Tournament worldwide.[1] Out of these 20 million individuals, ten finalists were chosen. While

---

[1] *See* Eric Alt, *Victory is Sweet for this Candy Crush All-Stars 2023 Champion*, ACTIVISION BLIZZARD, INC. (June 22, 2023),

PLAINTIFF'S STATEMENT PURSUANT
TO ORDER TO SHOW CAUSE
CASE NO. 2:25-cv-09082-FLA-MAR

Defendants have not disclosed the citizenship of all ten finalists, media coverage indicates that 2 out of the top 3 finalists were from the United States.[2] At the end of 2023, the United States' population was roughly 335 million people.[3] California, the most populous state in the United States, had a 2023 population of about 39.2 million people.[4]

These materials from the public record as well as Plaintiff's allegations in the Complaint provide reasonable grounds for conservative, complaint-tethered AIC inputs that satisfy the AIC requirement.

## IV. CAFA JURISDICTION IS SATISFIED

Based on the allegations in Plaintiff's Complaint and reasonable assumptions, CAFA jurisdiction is satisfied as the class size is at least 100 members, there is minimal diversity, and the amount in controversy exceeds $5,000,000.

### A. CAFA NUMEROSITY AND MINIMAL DIVERSITY ARE MET.

The California class as pled easily exceeds 100 members as Plaintiff seeks to represent "[a]ll individuals residing in California who participated in the Candy Crush All Stars 2023 Tournament and made in-app purchases." (Compl., ¶ 105.) As set forth below in the discussion concerning the amount in controversy, the allegations in the Complaint and public record support the contention that the California class far exceeds 100 members. Additionally, minimal diversity exists

---

https://newsroom.activisionblizzard.com/p/victory-is-sweet-for-candy-crush.

[2] *See Sweet, Sweet Victory! Candy Crush ® All Stars Tournament Winner Announced – Meet Jay, the 2023 Champion*, PR NEWSWIRE (May 21, 2023; 2:07 PM), https://www.prnewswire.com/news-releases/sweet-sweet-victory-candy-crush-all-stars-tournament-winner-announced---meet-jay-the-2023-champion-301839083.html.

[3] Aliza Chasan, *U.S. Population Grew to More Than 335 Million in 2023. Here's the Prediction for 2024*, CBS NEWS (Dec. 28, 2023; 6:09 PM), http://cbsnews.com/news/us-population-expected-to-top-335-million-by-new-years-day-2024/

[4] *See* https://www.macrotrends.net/global-metrics/states/california/population

ROPERS MAJESKI
A Professional Corporation
Los Angeles

because at least one class member is a citizen of a state while at least one defendant is a citizen or subject of a foreign state. *See* 28 U.S.C. § 1332(d)(2)(C). Plaintiff is a citizen of California, while Defendant King, an international corporation, is a citizen of Malta with its principal place of business in St. Julian's, Malta. (Compl., ¶¶ 18–19.)

### B.   THE AGGREGATE AMOUNT IN CONTROVERSY EXCEEDS $5,000,000 BY A PREPONDERANCE OF THE EVIDENCE.

The Ninth Circuit has noted that when a party's jurisdictional allegations are challenged under CAFA, the party's "showing on the amount of controversy may rely on reasonable assumptions." *Arias*, 936 F.3d at 921; *Perez*, 131 F.4th at 806. Furthermore, the AIC calculation may also account for attorneys' fees and punitive damages. *See Arias*, 939 F.3d at 922; *see also Greene v. Harley-Davidson, Inc.*, 965 F.3d 767, 772 (9th Cir. 2020). Accounting for the total compensatory damages to California consumers, attorneys' fees, and punitive damages, Plaintiff easily satisfies the AIC requirement.

#### 1.   Damages in the form of refunds of in-app purchases during the Tournament alone satisfy the AIC requirement under CAFA.

Plaintiff seeks a full refund of all in-app purchases made during the Tournament by California participants who were induced to spend money in the Tournament based on Defendants' deceptive practices. (Compl., ¶¶ 104; 114–147; pp. 32-33.) A full refund to the entire California class clears the AIC requirement under CAFA.

Defendants have disclosed that about 20 million individuals participated in the Tournament worldwide. Of these 20 million individuals, ten individuals advanced to the finals. Of these ten, the nationalities of three individuals were disclosed. 2 out of the top 3 were from the United States. Thus, it reasonably follows that out of the 20 million Tournament participants, approximately 66%–or

ROPERS

MAJESKI

A Professional Corporation
Los Angeles

1  13.3 million–were from the United States.

2         In 2023, out of the 335 million people in the United States, 39.2 million were

3  from California. Stated differently, in 2023, California accounted for 11.7% of the

4  U.S. population. Accordingly, it follows that of the estimated 13.3 million U.S.

5  Tournament participants, roughly 1.55 million participants were from California.

6         Spending in the Tournament varied from player to player. However, in

7  similar cases, individuals have sued Defendants in Tournament-related litigation for

8  as little as $9.99 to as much as $5,000. *See Bailey v. King.com Limited, et al.*

9  Complaint, attached hereto as **Exhibit A**, p. 1 (alleging individual Tournament-

10 related losses of $9.99); *Montoya v. King.com Limited, et al.* Complaint, attached

11 hereto as **Exhibit B**, ¶¶ 27, 106 (alleging individual Tournament-related losses of

12 $3,000); *Smith v. King.com Limited, et al.* Complaint, attached hereto as **Exhibit C**,

13 p. 1 (alleging individual Tournament-related losses of $5,000). Using the most

14 conservative estimate, if we assume that the estimated 1.55 million California

15 participants spent only $9.99 each, the California class would stand to recover

16 **$15,484,500** in restitution alone. However, if the Court were to assume that

17 California players spent in the thousands-of-dollars range, as Plaintiff has alleged

18 and Ms. Montoya and Ms. Smith alleged in separate lawsuits, the figure could be as

19 high as **$7,750,000,000**.

20        Even if only 20,000 California players made Tournament-related purchases,

21 if we were to assume an average of $300 spent on in-app purchases per player—an

22 amount far below what Plaintiff spent in the Tournament—then the AIC would be

23 satisfied at $6,000,000.

24        The above calculations are tethered to the Complaint and to Defendants'

25 public disclosures and the public record, and are sufficient to satisfy the AIC

26 requirement under CAFA.

27

28

ROPERS MAJESKI
A Professional Corporation
Los Angeles

- 6 -

PLAINTIFF'S STATEMENT PURSUANT
TO ORDER TO SHOW CAUSE
CASE NO. 2:25-cv-09082-FLA-MAR

2.    **Attorneys' fees and punitive damages push the AIC even higher**.

Where a statute authorizes fee-shifting as the CLRA does, prospective attorneys' fees through judgment count toward CAFA's amount in controversy requirement. *Arias*, 936 F.3d at 922. Even a modest projected fee of $1-1.5 million will bolster the conservative estimate above. Similarly, Plaintiff seeks punitive damages under the CLRA and common-law fraud, and even a conservative single-digit ratio (*e.g.*, 1:1) applied to compensatory damages further increases the AIC to an amount well in excess of $5,000,000.

If the Court halved the purchasing-player count or the average spend in the scenarios above, the AIC still clears $5,000,000 once fees and punitive damages are included—precisely the type of reasonableness analysis the Ninth Circuit endorses. The table below summarizes Plaintiff's projected AIC calculations:

| Method | Input Assumptions | Calculation | Amount in Controversy |
|---|---|---|---|
| Compensatory Damages Only | 1.55M California Tournament Participants; $9.99 spend per participant | 1,550,000 x $9.99 | **$15,484,500** |
| Compensatory Damages + Attorneys' Fees | $15,484,500 in compensatory damages; $1,000,000 in attorneys' fees through judgment on the merits | $15,484,500 + $1,000,000 | **$16,484,500** |
| Compensatory Damages + Attorneys' Fees + Punitive Damages | $15,484,500 in compensatory damages; $1,000,000 in attorneys' fees through judgment on the merits; 1:1 ratio of compensatory damages to punitive damages | ($15,484,500 x 2) + $1,000,000 | **$31,969,000** |

Accordingly, Plaintiff has demonstrated that CAFA's AIC requirement is satisfied and that this Court has subject matter jurisdiction under CAFA in this dispute.

V.    **CONCLUSION**

Plaintiff has demonstrated by a preponderance of the evidence that CAFA's

ROPERS MAJESKI

A Professional Corporation
Los Angeles

- 7 -    PLAINTIFF'S STATEMENT PURSUANT TO ORDER TO SHOW CAUSE CASE NO. 2:25-cv-09082-FLA-MAR

AIC requirement has been met under multiple, conservative calculations tied to the Complaint and the public record. The Ninth Circuit instructs courts to accept such reasonable assumptions in the jurisdictional calculus. Accordingly, Plaintiff respectfully requests that the Court find that subject matter jurisdiction exists under CAFA and discharge the OSC.

Dated:  October 24, 2025                    ROPERS MAJESKI PC


By: */s/ Susan J. Welde*
    SUSAN  J. WELDE
    Attorneys for Plaintiff
    RUBEN VALENZUELA


Dated:  October 24, 2025                    JASZCZUK P.C.


By: */s/ Martin W. Jaszczuk*
    MARTIN W. JASZCZUK (*PRO HAC VICE*)
    MARGARET SCHUCHARDT (*PRO HAC VICE*)
    AKSHAY SOMAN *(PRO HAC VICE)*
    Attorneys for Plaintiff
    RUBEN VALENZUELA

4897-3961-1253.1

PLAINTIFF'S STATEMENT PURSUANT
TO ORDER TO SHOW CAUSE
CASE NO. 2:25-cv-09082-FLA-MAR

# -EXHIBIT A-

This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Circuit Courts.
Forms are free at ilcourts.info/forms.

System Generated Hearing Date: <<Coba-HearingStan>>
Location: <<CmsHearingResource-Location>>
Judge: <<CmsHearingResource-"JudicialOfficer">>

| STATE OF ILLINOIS, CIRCUIT COURT | SMALL CLAIMS COMPLAINT | For Court Use Only |
|---|---|---|

Cook _____ COUNTY

**FILED**
2/21/2025 1:57 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
20251105280
Courtroom, 1501
31517974

FILED DATE: 2/21/2025 1:57 PM   20251105280

**Instructions ▼**

Directly above, enter the name of the county where you are filing the case.

Byran Bailey
**Plaintiff** *(First, middle, last name)*

Enter your name as Plaintiff.

v.

Enter the names of all people or businesses you are suing as Defendants.

The Circuit Clerk will add a Case Number.

**Defendants** *(First, middle, last name or business name)*:
King.com Limited

King Digital Entertainment PLC

Activision Blizzard, Inc.

**20251105280**

**Case Number**

**Jury Trial Request by Filing Separate Form.** If you want your case decided by a jury instead of a judge, you have to file a *Jury Request* form. Jury trials can sometimes be more complicated and an additional fee may be required.

---

In **1**, enter your name.

1. I, __Byran Bailey_____ , am the Plaintiff.
   *First, Middle, Last*

In **2**, enter the name and address of each Defendant.

If you are suing more than 2 Defendants, use the *Additional Defendants (Small Claims Complaint)* form and attach it.

2. Defendant's name and address is: King.com Limited
   *First, Middle, Last*
   Aragon Business Centre, Level 4, Dragonara Road, St Julian's, Malta STJ3140
   *Street, Unit #_____ City_____ State_____ ZIP*

   Defendant #2's name and address is: King Digital Entertainment PLC
   *First, Middle, Last*
   6th Floor, 2 Grand Canal Square, Dublin 2, D02A342, Ireland
   *Street, Unit #_____ City_____ State_____ ZIP*
   ☑ I have listed additional Defendants on the attached *Additional Defendants (Small Claims Complaint)* form.

In **3**, enter the amount of money that is owed to you. It must be $10,000 or less. Do not include court costs. Check **3a**, **3b**, or **3c**. If you have a written agreement, attach that contract or other document as proof of your agreement to this *Small Claims Complaint,* or explain why you cannot.

3. Defendants owe me __$ 9.99_____ and *(check one)*:
   ☐ a.  I have no written agreement with Defendants.
   ☐ b.  I have a written agreement with Defendants and it is attached.
   ☑ c.  I have a written agreement with Defendants but I have not attached it because:
   the bases of my causes of action are in statute and Illinois common law.
   _____ .

In **4**, check the box if it applies.

4. ☑ I have demanded payment of the amount listed in Section 3 and Defendants have failed to pay in full.

---

CS-C 702.4    Page 1 of 2    (06/24)

Enter the Case Number given by the Circuit Clerk:_____

| | |
|---|---|
| In **5**, enter the reasons why Defendant owes this money to you. | **5.**  Defendants owe me this amount of money because:  _____<br><br>The details of my dispute with Defendants are outlined in the Demand which is attached as Exhibit A. |
| If you need more space, complete the *Additional Reasons (Small Claims Complaint)* form and check the box. | |

☑  I have attached an *Additional Reasons (Small Claims Complaint)* form.

| | |
|---|---|
| Under Illinois Supreme Court Rule 137, your signature means that you have read the document, that to the best of your belief, it is true and correct and that you are not filing it for an improper purpose, such as to cause delay. | /s/ Akshay Soman<br>*Your Signature*                     Akshay Soman<br>                                             *Print Your Name* |
| If you are completing this form on a computer, sign your name by typing it. If you are completing it by hand, sign and print your name. | 311 S. Wacker Dr.<br>*Street Address*                     Chicago, IL  60606<br>                                             *City, State, ZIP*<br><br>(312) 442-0412<br>*Telephone*                             asoman@jaszczuk.com<br>                                             *Email Address* |
| Enter your complete address, telephone number and email address, if you have one. | Firm No. 61115<br>*Attorney # (if any)* |

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

CS-C 702.4                          Page 2 of 2                          (06/24)

*(left margin, vertical)* FILED DATE: 2/21/2025 1:57 PM   20251105280

FILED
2/21/2025 1:57 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
20251105280
Courtroom, 1501
31517974

FILED DATE: 2/21/2025 1:57 PM    20251105280

# IN THE CIRCUIT COURT OF COOK COUNTY
## COUNTY DEPARTMENT, MUNICIPAL DIVISION

| | |
|---|---|
| Byran Bailey, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. **20251105280** |
| | ) |
| King.com Limited, King Digital Entertainment | ) |
| PLC, and Activision Blizzard Inc., | ) |
| | ) |
| Defendants. | ) |

## DEMAND

Plaintiff Byran Bailey ("Plaintiff" or "Byran"), by and through her attorneys, Jaszczuk

P.C., and for her complaint against Defendants King.com Limited ("King"), King Digital

Entertainment PLC ("King Digital") and Activision Blizzard, Inc. ("Activision," and together

with King and King Digital, "Defendants"), states as follows:

## INTRODUCTION

1.      On March 23, 2023, Defendants launched Candy Crush All Stars 2023, a mobile

gaming contest based on the popular Candy Crush application.  Promising $250,000 in prizes

and an expense-paid trip to London for 10 finalists, Defendants sought to entice gamers to enter

the competition and put their skills to the test against other players around the world.  All in good

fun.  Or was it?

2.      As it turns out, behind the bright colors, adorable icons and happy music—all of

which serve to entertain users and to keep them coming back—there is another aspect to the

game.  An aspect that does not serve users but, instead, serves Defendants: the option for users to

purchase a variety of intangible items, such as extra lives and boosters, that benefit players in the

1

game.

3.      In short, Defendants give players the option to use the money they earned in the real world, which could be used to purchase milk, bus rides, or staplers, to instead purchase extra lives, color bombs, lollipop hammers, and extra moves – all of which help players be more successful playing Candy Crush.

4.      And that is, largely, how Defendants earn money.  Quite a bit of it, in fact.  In 2014, Candy Crush users reportedly spent over $1.3 billion on in-app purchases.[1]

5.      But Defendants have a problem.  The vast majority of players decline the invitation to trade real dollars for intangible inventions.[2]  And so, Defendants must come up with new ways to entice more users to spend money and to spend more of it.

6.      Enter Candy Crush All Stars 2023 (the "Tournament").

7.      With $250,000 in prizes and an expense-paid trip to London on the line, Candy Crush players were presented with plenty of incentive to show up, enter the Tournament and spend their money on a variety of boosters and extra lives to help them beat their fellow competitors to one of the ten available golden tickets to London.

8.      And show up they did.  In droves.  Some users have estimated that over one million players advanced to the "Semi Finals."[3]  And all these players, faced with the allure of a six-figure grand prize and a trip to England, were well incentivized to spend their funds on in-app purchases.

9.      There is, perhaps, a debate to be had about the interplay between such incentives,

---

[1] https://www.theguardian.com/technology/2015/feb/13/candy-crush-saga-players-855m-2014.
[2] *Id.*
[3] Excerpt from Candy Crush Reddit Forum,
https://www.reddit.com/r/candycrush/comments/12wto6j/over_1000000_in_the_semi_finals_of_all_stars/

2

companies' profit-making motives, and personal choice. But such philosophical and political discussions are beyond the scope of this Demand.

10.     Instead, this Demand is focused on one key proposition: consumers are entitled to be presented with the information they will need to make an informed decision about whether to spend their funds on in-app purchases. And this is where Defendants' conduct fell short. Woefully short.

11.     Specifically, Defendants failed to inform Plaintiff, and in some instances actively misrepresented, four key pieces of information: (1) the number of players advancing through each Tournament stage, (2) that some competitors gain an unfair advantage by cheating, (3) that some competitors have an unfair advantage because they have unlocked game modes that give them enhanced abilities ("Super Users"), and (4) that some users can play offline, which masks their running scores.

12.     _Number of Players_ – While Defendants have not released exact numbers, it appears that well over one million players took part in the Tournament. And Defendants stood to profit handsomely if they could convince a significant portion of these players to make in-app purchases in an effort to finish in the top ten on the Tournament leaderboard. But Defendants knew that a player who recognizes that she is currently number 27,412 on the leaderboard will be unlikely to spend significant funds on in-app purchases. So, at each stage of the Tournament, Defendants placed contestants into artificially small groups of no more than 50 players, and used terms such as "Quarter Finals" and "Semi Finals," to manipulate users into thinking that they were doing well against their peers and were getting close to the 10 coveted London spots. On information and belief, this tactic worked wonderfully—from a fiscal perspective—for Defendants. Players in small groups spent dearly to outcompete others, thinking that they had a

FILED DATE: 2/21/2025 1:57 PM    20251105280

FILED DATE: 2/21/2025 1:57 PM    20251105280

legitimate chance of advancing further, if they could only win their particular pool. This was unadulterated deception.

13.    _Cheaters_ – Within days of the Tournament's start, Candy Crush-related bulletin boards lit up with Tournament contestants complaining about rampant cheating. There are a plethora of examples. Suffice it to say, Defendants were well aware that cheating was highly probable, but failed to put proper measures in place to prevent cheating and failed to adequately deal with cheaters once the Tournament began. This put honest players at a significant disadvantage and caused honest players to spend more money on in-app purchases trying to beat the cheaters. It also caused honest players to enter the Tournament to begin with, which many would not have done had they known that they would be competing with cheaters.

14.    _Super Users_ – Some players have played Candy Crush for so long and have gotten so far in the game that they have earned in-app abilities that are not available to mere mortals – they become "Super Users." When Super Users play Candy Crush, their powers (_e.g._, ability to play previous boards that have score multipliers) make it significantly easier for them to score points. Player commentary available online indicates that a number of Super Users took part in the Tournament and, unsurprisingly, easily beat their competitors. Defendants failed to disclose to Plaintiff both the existence of Super Users and that Super Users would be permitted to take part in the Tournament with their super powers unchecked. This had the intended effect of misleading Plaintiff into thinking they had a fair chance of competing and caused them to spend money on in-app purchases they otherwise would not have spent.

15.    _Offline Players_ – While playing the Tournament, players are shown a live leaderboard that informs them of their current standing. Players use their standing to make a reasoned determination about the benefit of in-app purchases. For instance, a player ranked #35

4

FILED DATE: 2/21/2025 1:57 PM    20251105280

in a pool of 50 players may decide that paying for boosters is not a sound financial proposition, while a player ranked #3 might determine that paying a few hundred dollars to get to first place is a good bargain. But a player can only make a reasoned choice if she has an accurate gauge of where she stands. And, as it turns out, Defendants misled Plaintiff on this account as well. Specifically, Defendants permitted players to play "offline" at times. During these periods, the offline players were earning significant points, whereas their scores on the official leaderboard appeared unchanged. Then, with minutes left in the game, the offline players came back online and leapfrogged over Plaintiff who, all along, were making their purchasing decisions based on their perceived standing on the leaderboard. By failing to disclose the existence and prevalence of offline players, Defendants caused Plaintiff to make in-app purchases they otherwise would not have made had they known their true standing on the leaderboard.

16. In all, Defendants' actions in misrepresenting and concealing the number of players in the competition, and the existence of cheaters, Super Users and offline players, had the effect of causing Plaintiff to overestimate their chances of success, which in turn had the intended effect of causing Plaintiff to spend significant sums on in-app purchases that they otherwise would not have spent.

17. Accordingly, Plaintiff brings this action to remedy Defendants' deceptive conduct in connection with Defendants' operation of the Tournament. Defendants induced Plaintiff to participate in the Tournament—and spend countless hours of time on the game and untold amounts of money on in-app purchases—with the promise of a fair chance at winning a share of a $250,000 grand prize. In reality, however, the Tournament was administered by Defendants in a deceptive manner that tricked players into believing they were performing better in comparison to other players than they actually were, and the competition was riddled with cheating and other

FILED DATE: 2/21/2025 1:57 PM    20251105280

conduct that severely decreased Plaintiff's chances of winning, which Defendants knew but failed to remedy.  Plaintiff brings this action for violations of Illinois' consumer protection statute, as well as unjust enrichment and fraud.

## FACTUAL BACKGROUND

18.    In the past ten years, mobile gaming has become ubiquitous in American society. Whereas twenty years ago consumers were limited to rudimentary games like Tetris and Snake, the advent of smart phones and—perhaps more importantly—technology that allows consumers to seamlessly make in-app purchases, has led to an explosion in the market for mobile gaming.

19.    There is also, however, a dark side to the mobile gaming craze – the games can be extremely addictive and financially ruinous.[4]  And in many cases the addictiveness of the games is by design, as mobile gaming companies make more money if consumers spend more time gaming and, critically, making in-app purchases.

20.    One of the pioneers of this business model is Defendant King, which developed the wildly popular game, Candy Crush Saga ("Candy Crush").[5]

21.    King launched Candy Crush as a mobile game available on iOS in 2012.  Almost immediately after its release, Candy Crush became one of the most popular and profitable mobile games on the market.[6]

22.    From 2012 to 2013, the first year Candy Crush was available for iOS, King's revenue increased 1084%.[7]

---

[4] Addictions Content Team, *A New Addiction on the Rise: Mobile Game Addiction*, ADDICTIONS (July 7, 2021), https://www.addictions.com/blog/a-new-addiction-on-the-rise-mobile-game-addiction/.
[5] *Id. See also* Eliana Dockterman, *Candy Crush Saga: The Science Behind Our Addiction*, TIME (Nov. 15, 2013), http://business.time.com/2013/11/15/candy-crush-saga-the-science-behind-our-addiction.
[6] David Curry, *Candy Crush Revenue and Usage Statistics (2023)*, BUSINESS*OF*APPS (Jan 9, 2023), https://www.businessofapps.com/data/candy-crush-statistics/.
[7] *Id.*

23.    In large part as a result of Candy Crush's success, King was able to go public in 2013, and was subsequently acquired by Defendant Activision Blizzard for $5.9 billion in 2016.

24.    In the period 2013 through 2017, Candy Crush was consistently the first or second most popular mobile game on the market.[8]

25.    The game's popularity has hardly waned.  In 2022, 138 million users downloaded Candy Crush from the iOS app store and Google Play.[9]  And in 2021, Candy Crush generated over $1 billion in revenue.[10]

**A.  THE CANDY CRUSH GAME**

26.    Candy Crush is a match-making puzzle game.  Users—who can play the game on both iPhones and Android devices—attempt to "crush" candies by matching three or more of the same candy icons in consecutive order, thus clearing them from the game board and earning points.

27.    Each game starts with a fresh game board, for which users are assigned a specific goal, such as accumulating a given number of points.  But users are given a limited number of moves or turns to reach the given goal.

28.    If a user fails to accomplish the goal within the given number of turns, she loses a life ("Life" or "Lives") and must start the board over again.

29.    Players are only afforded five Lives at the outset of the game.  Once users lose those five Lives, they must wait thirty minutes for a new Life to regenerate before they can play again.

---

[8] *Id.*

[9] Jordan Bevan, *Candy Crush Saga Revenue and Usage Statistics*, MOBILE MARKETING READS (Jan. 11, 2023), https://mobilemarketingreads.com/candy-crush-saga-revenue-and-usage-statistics-2020/.

[10] *Id.*

7

FILED DATE: 2/21/2025 1:57 PM    20251105280

30.     But waiting is not the only option.  Users who want to continue playing without waiting 30 minutes are given the option of purchasing more Lives, which then permits them to continue playing immediately.

31.     And thus enters the true point of the game—at least from Defendants' perspective—the in-app purchases by which Defendants earn revenue.

32.     Since the game's inception, Defendants have created a variety of in-app purchases to entice gamers to spend money.  In addition to buying Lives, users can purchase a variety of boosters, such as lollipop hammers, extra moves, free switches, and UFOs, all of which enable players to increase their scores or otherwise "crush" candies more effectively.

### B.  THE CANDY CRUSH ALL STARS 2023 TOURNAMENT

33.     In 2021, Defendants generated over $1 billion in revenue from Candy Crush, a significant portion of which derived from in-app purchases.[11]

34.     While this number seems astounding for a simple mobile game, more surprising is that this revenue was generated from a very small proportion of players, as the vast majority of users do not spend money on the app and play for free.[12]

35.     As such, even though Candy Crush is already a smashing financial success, from a corporate perspective there is a significant untapped supply of free riders who can potentially be induced to become paying users.

36.     But how best to do so?

37.     Enter Candy Crush All Stars 2023.

38.     Defendants billed the Tournament as the "sweetest and biggest tournament of the

---

[11] *Id.*
[12] Stuart Dredge, *Candy Crush Saga players spent £865m on the game in 2014 alone*, THE GUARDIAN (Feb. 15, 2015, 6:45 AM EST) https://www.theguardian.com/technology/2015/feb/13/candy-crush-saga-players-855m-2014.

FILED DATE: 2/21/2025 1:57 PM    20251105280

year."[13]

39.     Prizes included a share of $250,000, a trip to London for the Tournament final for ten finalists, and customized Candy Crush-inspired championship rings with a combined value of over $72,900.[14]

40.     Tournament competitors were tasked with collecting special purple star shaped candies and ostensibly could track their score and rank relative to other players on a leaderboard.

41.     The Tournament was divided into nine separate stages, beginning with qualifier rounds and eventually progressing to Quarter Finals and three stages billed as Semi Final 1, Semi Final 2, and Semi Final 3, followed by the Final in London, England.

42.     At each stage, users' scores were displayed on Tournament leaderboards with up to 50 contestants, and competitors were required to place at or above a certain rank in their given leaderboard to qualify for the next round.

43.     In total, 10 players would qualify for the Final.  But, other than the Final, Defendants did not specify how many individuals would qualify for each successive Stage.

44.     The Tournament commenced on March 23, 2023.

45.     As promoters and financial beneficiaries of the Tournament, Defendants had an obligation to users to ensure that the Tournament was structured and overseen in a manner that ensured a baseline level of integrity, transparency, and fairness.

46.     But soon after the Tournament commenced, it became clear that the contest

---

[13] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/349656/%EF%BB%BFall-stars-the-sweetest-and-biggest-candy-crush-saga-tournament-of-the-year/p1.
[14] Lewis Rees, *Candy Crush Saga breaks records with All Stars Tournament*, POCKET GAMER (Mar. 20, 2023), https://www.pocketgamer.biz/news/81104/candy-crush-saga-breaks-records-with-all-stars-tournament/.

Defendants had billed as "an exciting competitive tournament"[15] was in reality more akin to a scam.

47.    Specifically, Defendants structured the Tournament in a deceptive manner to create a false impression that players' odds of qualifying for the Final were higher than they actually were.  The reason was monetary – obscuring users' true odds of winning kept them invested in the Tournament, and more importantly, kept them spending money on in-app purchases.

48.    Defendants did so in at least four ways:

49.    *First*, Defendants deceived Plaintiff as to the number of competitors and, concomitantly, the true chances of making the Final round.

50.    Defendants segmented the Tournament into nine stages, from which a certain number of users would qualify for each successive stage.  To qualify, players had to attain a specified rank within a Tournament leaderboard group that included up to 50 players.

51.    But other than indicating that there would be 10 finalists, Defendants never informed Plaintiff how many other players were taking part in the competition.  To the contrary, Defendants did what they could to mislead contestants into thinking that they were doing well vis-à-vis their competitors, that there were few other players against whom they were competing, and that they had a good chance of making the Finals in London.  That kept Plaintiff spending money on in-app purchases.

52.    For instance, Defendants never provided an aggregate leaderboard or any other information that accurately represented how many competitors were still in the Tournament.  Instead, Defendants placed gamers into small Tournament leaderboard groups of 50, which

---

[15] *Supra*, excerpt from King Community Forum, at n.17.

FILED DATE: 2/21/2025 1:57 PM    20251105280

FILED DATE: 2/21/2025 1:57 PM    20251105280

ensured that contestants were only able to gauge their performance against a statistically insignificant number of competitors. More importantly, it kept Plaintiff incentivized to spend money on in-app purchases. After all, a contestant who thinks that she is #6 in her group of 50 is far more likely to spend money on in-app purchases than a contestant who can see that she is in position #126,456 out of 1 million.

53.  Defendants paired this deceptive small-group structure with misleading stage names to make contestants believe that they were approaching the Finals. To that end, Defendants used terms such as "Semi Finals" and "Quarter Finals," terms that are commonly understood to mean that competitors are one and two stages, respectively, from the Finals (and are typically also indicative of a stage in the contest where there are only four and eight competitors remaining).

54.  That was far from reality. Some players have estimated that over one million players advanced to the "Semi Finals."[16]

---

[16] *Supra*, Excerpt from Candy Crush Reddit Forum, n.3.

FILED DATE: 2/21/2025 1:57 PM    20251105280

# Over 1.000.000 in the "Semi Finals" of All Stars

I think we all know by now that Candy Crush All Stars is/was a scam. Giving you hope and the feeling that you are so close to the final with a trip to London, that the "investment" is worth it.
It's not, and it never was.

Doing the math, in the three rounds of the semi finals, only 1:50 progressed each. So for each of the 10 finalists, there are 50 in the last round of the semifinals, 50 times 50 in the second round and 50 times 50 times 50 in the first round of the semi finals.

In other words: 1.250.000 players progressed into the "Semi Finals". This wording gave each a feeling of chance, that there is a possibility to win a trip to London. But if you know, that there is a million others against you and getting points is more about spending money than skill, would you continue to participate?

55.    Defendants' decision to place contestants into small leaderboard groups and to use misleading stage names created a false impression that was designed by Defendants to increase in-app spending.

56.    One competitor summed it up fairly succinctly:[17]



christinewupp Posts: 791    Level 3
April 19

I have been really saddened by reading so many players have spent so much of their money on All Stars.

Those of us with years of experience and some mathematical knowhow have tried from the outset to warn others that there are millions competing in the semi finals and that only the madly obsessed non stop players or cheaters stand a chance of winning. Why have so many people been duped into believing they could win? It's not your fault: King have deliberately kept the number of competitors secret, introduced so many wild card rounds and chances to make it really easy for anyone to qualify for the semi finals. The term "semi final" was misleading to a huge degree, making people think they were anywhere near the final, like it is in the world cup. The whole tournament is designed to mislead players into spending money for what was essentially a lottery.

Ah yes, and everyone who filled out the contact form will get lots of spam soon because the data is sold to third parties.

⚑ Flag    ❝ Reply    ♥ 4 Helpful    ♦ 1 Sweet    ♥ 2 Love    ☺ 1 Haha

---

[17] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/401713/all-stars-was-it-really-worth-it/p1.

FILED DATE: 2/21/2025 1:57 PM    20251105280

57.      Another competitor revealed that, after everything was said and done, he had spent more money on in-app purchases during the Tournament than it would have cost him to simply purchase a plane ticket and accommodations in London:[18]



zedzee Posts: 13   Level 2
April 19

All I can say is " we are in the same boat ". I put 3 credit cards in my Auto Payment. After 4 days straight of playing CCSaga All Stars, I am now owing my credit cards, more than the total amount of the R/T tickets to London + hotel accommodation. It felt like I was possessed when I was playing it that I did not mind about the bills I would incur after the tournament.

⚑ Flag  ❝ Reply  💡 Helpful  👍 1 Sweet  ♥ 1 Love  😄 1 Haha

58.      The dismay expressed by the foregoing user, and the financial harm he has suffered, were both directly caused by Defendants' deceptive conduct.  There is more.

59.      *Second*, Defendants failed to disclose the existence of, and failed to properly deal with, cheaters.

60.      When Plaintiff agreed to participate in the Tournament and to spend time and money competing, they did so with the expectation that the competition would be fair.

61.      It was anything but.

62.      As the Tournament progressed, user complaints documenting suspicious activity and Defendants' indifference to those concerns quickly began surfacing on Defendants' own forum.[19]

---

[18] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/comment/2614682#Comment_2614682.
[19] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/comment/2616175#Comment_2616175; https://community.king.com/en/candy-crush-saga/discussion/comment/2617209#Comment_2617209.

FILED DATE: 2/21/2025 1:57 PM    20251105280



**MelleLilou** Posts: 19   Level 2
April 20

Totally agree with you. I started the competition as soon as the second semi-final was launched. When my scoreboard opened after my first game, the first players were already over 30,000 points! I took screenshots to monitor the scores and the time elapsed. In 5 minutes, I won 15/20,000 points maximum, they won 200,000! How is it possible ?!

Either they are bots and therefore impossible to beat, or they are real players who cheat or are favored by King. I won all my games, my races of champions, I never managed to integrate the top 10 of my table so much the scores increased quickly. I gave up after 6 hours when they reached 1 million points (how is that possible?!) when I was barely at 400,000.

This morning when opening the game (I'm in France, it's barely 9:30 am here) the first players reached 3 million points. I have played enough to know that it is impossible to reach such a score even without taking a break. There is therefore cheating and/or rigging of scores.

⚑ Flag   ❝ Reply   ♀ 2 Helpful   👍 Sweet   ♥ 5 Love   ☺ Haha



**JDTEX000** Posts: 9   Level 2
April 20

So I found out they can play this game on a phone and change the time ahead on their phone and it'll allow them to start earlier and if they are offline the system won't catch it . I watched the countdown and literally a second after it started some guy was at 500k so I put some money into it and lots and lots of time and he stayed a good 500k ahead every second all the way to the last second

⚑ Flag   ❝ Reply   ♀ Helpful   👍 Sweet   ♥ Love   ☺ 1 Haha

63.     Properly investigating reports of cheating or implementing systems to prevent it at the scale needed for the Tournament would have decreased the profitability of the Tournament. So instead, Defendants either failed to investigate reports of cheating or, in some cases, did a cursory review and followed up with vague non-committal statements.

64.     And that put honest players at a significant disadvantage and caused Plaintiff to spend money on in-app purchases they otherwise would not have spent.

65.     *Third*, Defendants failed to disclose the existence of Super Users.

14

FILED DATE: 2/21/2025 1:57 PM    20251105280

66.     When Plaintiff entered the Tournament, they believed they had a fair chance of competing against other players.  Not so.  As it turns out, without providing any disclosure, Defendants permitted entry into the Tournament to individuals who had previously completed all of the 14,018 Candy Crush boards – let's call them "Super Users."

67.     Players who complete all available 14,018 Candy Crush boards are given access to a Star Tournament ("ST") (not to be confused with the Candy Crush Saga All Stars 2023 Tournament).

68.     Once Super Users have reached the ST level, they are provided with access to game boards that are not available to ordinary users.  Some of these game boards provide point multipliers of up to 30x or more, which provide Super Users with the ability to score points at an extraordinary pace that ordinary users cannot match.

69.     One such Super User who took part in the Tournament posted an explanation on a Candy Crush-related message board:[20]

I've been playing for 59 minutes now and have scored 10,008, 980. I have to stop, a client requires my attention.

Later.

O course, 10 million points does not equate to 10 million purple stars that were in the All Stars Tournament, but it is an indicator, bearing in mind the x30 multiplier would have been applied, of the potential stars I might have won in these 59 minutes of play.

I could have played on for another hour or more on that one level/game. In the semi finals I used the points gained as my guide and the greatest number I attained was 25 million before choosing to end that game. To other players it may have looked that I was a bot, suddenly appearing on the leader board with a very high number of purple stars, when, in fact, I was online, playing one good board in the Star Tournament.

---

[20] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/402853/ten-million-points-in-59-minutes-explained/p1

FILED DATE: 2/21/2025 1:57 PM    20251105280

> I ended games so that other players could get a sense of my score and because I felt out of touch with the leader board. I was neck and neck with the player in second place for most of the night and they also *appeared* to me to be offline at times. They *may* have been doing exactly what I was doing. This was the only real element of fun – the rest of the experience was gruelling but it demanded commitment.
>
> This is my explanation.
>
> My score is totally dependent on my use of boosters that I have built up over 10 years. There is a cascade effect by using the combination of a colour bomb and hammer/pink lollipop. Creating lots of colour bombs and then exploding one which sets off a chain reaction. At one stage in the 3rd semi final the game played itself for 10 minutes and generated *loads* of very welcome points.
>
> ⚑ Flag  ❝ Reply  ♀ 2 Helpful  👍 Sweet  ❤ Love  😄 1 Haha

70.    Perhaps most interestingly, this Super User, while noting that his technique was legitimate as it was created by King, admitted that playing the Tournament as he did—with the 30x point multiplier that is available to Super Users but not to ordinary contestants—was "not really within the *spirit* of the game."  When another competitor said it was unfair, he responded: "It isn't fair.  I agree with you."[21]



---

[21] Excerpts from King Community Forum, *id.*; https://community.king.com/en/candy-crush-saga/discussion/402853/ten-million-points-in-59-minutes-explained/p3.

FILED DATE: 2/21/2025 1:57 PM    20251105280



71.    To be clear, this Demand does not place blame on this particular Super User, or any other Super Users for that matter.  Super Users are not at fault for reaching the end of the game and being rewarded, by Defendant King, with super powers.  The fault here lies entirely with Defendants, who failed to either (a) limit the abilities of Super Users during the Tournament to ensure a level playing field, or (b) disclose to Plaintiff that they would be competing against Super Users, who had available to them in-game abilities that, for all intents and purposes, would make them virtually unbeatable by ordinary users.

72.    Indeed, unbeknownst to Plaintiff, ordinary users were in a situation not unlike pitting a junior high school football team against NFL players.

73.    Had she known about the existence of Super Users, Plaintiff would not have made the in-app purchases she made throughout the Tournament.

74.    One competitor—without Super User abilities—aptly summarized the point as

17

FILED DATE: 2/21/2025 1:57 PM    20251105280

follows:[22]



**Matjes** Posts: 29    Level 2

April 28

**@John_Porter**

**For me, you are not a fraudster. You simply use your collected boosters. Unfortunately, you have an advantage (like other players): You play star event and can choose a good point level within a certain framework. I can't do that. With the same number of boosters used, you have of course collected much more purple stars. For us normal players, there is no chance to win. That's not a reproach against you because you can't do anything about it. If I repeat the semi-finals, I will therefore not waste any more money and only play normally and have fun. That's what the game is for. Good luck in the final if you're there** 😊 👍

⚑ Flag    ❝ Reply    ♀ Helpful    👍 2 Sweet    ❤ Love    😄 1 Haha



**chopstickcharmA** Posts: 56    Level 2

April 28

> **Matjes**  Apr 28, 2023
>
> **@John_Porter**
>
> For me, you are not a fraudster. You simply use your collected boosters.
> Unfortunately, you have an advantage (like other players): You play star event and
>
> ⌄

This is a perfect response. If you aren't in the Star tournament, you really never had a chance. King really created a cash grab scam.

⚑ Flag    ❝ Reply    ♀ Helpful    👍 1 Sweet    ❤ 1 Love    😄 Haha

75.    *Fourth*, Defendants failed to disclose the existence of Offline Players.

76.    Grouping players into artificially small groups, with no more than 50 on any

---

[22] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/402853/ten-million-points-in-59-minutes-explained/p2.

18

FILED DATE: 2/21/2025 1:57 PM    20251105280

given leaderboard was, as discussed above, patently misleading.  But that was not the only problem with the leaderboards.  A second issue is that they were inaccurate.

77.    Specifically, Defendants permitted players in the Tournament to play offline, meaning that certain players would be playing the game and accumulating points, but their true point totals would not be visible to Plaintiff in the same group until they came back online.

78.    The problem with this maneuver is that Plaintiff made their in-app purchasing decisions based on how they were doing vis-à-vis their competitors.  For instance, a player in third place may decide to spend money on boosters in an attempt to finish first, while a player in 12th place may decide to forego the same purchase.  The problem with offline players is that their true score is inaccurate while they are offline, thereby giving Plaintiff a misleading view of their standing on the leaderboard and an incentive to make in-app purchases that they otherwise may not be inclined to make.

79.    A number of Tournament competitors complained about this issue, pointing out how some offline players logged back in with minutes to spare and leapfrogged the competition:[23]



Riala  Posts: 6    Level 2
April 25

It is sad that there were so many offline dubious players maki g points that would be impossible to make. Too bad they didn't get grouped together themselves since they wait until last minute to see who guessed which impossible was going to win lol. It is sad that it looks like from how rampant this is is, no honest players are making it. I have not touched the game since I found out & learned my lesson.

⚑ Flag   ❝ Reply   👍 Helpful   👍 Sweet   ❤ Love   😄 Haha

---

[23] Excerpts from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/comment/2622023#Comment_2622023; https://community.king.com/en/candy-crush-saga/discussion/comment/2620238#Comment_2620238.

FILED DATE: 2/21/2025 1:57 PM    20251105280

But this N1 position wasnt even in the top 6 2:51 minutes earlier: (So this means that player was playing offline making millions of pts (at least 6.8MM in the last 2:51 minutes of play)



80.     Defendants failed to disclose to Plaintiff that they would be competing against offline users and that the leaderboard totals presented to them might be false or inaccurate. This failure induced Plaintiff to believe that they were performing better relative to other users than they actually were. This, in turn, caused Plaintiff to spend money on in-app purchases they otherwise would not have spent had they known their true standing.

81.     Each and every one of Defendants' above-described misrepresentations and omissions occurred every time Plaintiff viewed her scores on a leaderboard that (1) misrepresented the number of competitors against whom Plaintiff were playing and her true standing in the Tournament; (2) failed to disclose that other competitors in the Tournament were cheating; (3) failed to disclose that other competitors in the Tournament were "Super Users"; and (4) failed to disclose that other competitors in the Tournament were competing offline.

## C. BYRAN BAILEY'S ORDEAL

FILED DATE: 2/21/2025 1:57 PM    20251105280

82.    Plaintiff, Byran Bailey, is a father who resides in Chicago, Illinois.

83.    Byran started playing Candy Crush in 2022.

84.    Byran is an avid Candy Crusher, often playing late into the night. He particularly enjoyed the game because it was fun, interesting and visually appealing.

85.    Before the Tournament, Byran rarely paid for the various in-app purchases. However, in these limited instances, Byran knew what he was paying for and made a reasoned, *informed* decision to do so.

86.    All that changed when the Tournament began.

87.    Attracted by Defendants' advertisements on Facebook detailing a share of $250,000 in prize money, an all-expenses-paid trip to London, and customized rings, as well as the prospect of competing with his friends, Byran started playing in the initial qualifying round of the Tournament on March 2023.

88.    When the Tournament began, Byran was successful throughout the initial rounds. As he advanced, the competition got tougher, and Byran spent money on in-app purchases to keep up.

89.    But, enticed by Defendants' misrepresentations, Byran kept playing for hours and spent money at each stage in an attempt to keep advancing.

90.    Unfortunately, Byran's investment did not pay off and he was eliminated from the Tournament.

91.    In total, Byran spent approximately $9.99 on the Tournament, enticed by Defendants with the idea of winning cash and a trip to London playing what he had thought was a fair game.

92.    Had Byran known the true nature of the game, i.e., the existence of cheaters,

21

FILED DATE: 2/21/2025 1:57 PM    20251105280

Super Users, offline players, and misleading leaderboards, he would not have spent money on the in-app purchases during the Tournament. Indeed, Byran would not have even played in the Tournament at all if he was aware of Defendants' deceptions.

93. And perhaps we could blame Byran, and the millions of people like him who did the same, *if* the game had been fair. We could say that adults should not allow themselves to be led astray by sleek corporate marketing and clever corporate machinations designed to draw players into a game where they need to spend their wages on color bombs and lollipop hammers. After all, if a corporation can convince people that they should exchange their money earned in the real world for intangible thingamajigs in the cyber world, then people have only themselves to blame.

94. But whatever side of this debate one may choose to take, one point is beyond dispute: the game has to be fair and players must be given the information they need in order to make a reasoned, informed decision as to whether to spend their money on such items. And that's where things broke down.

95. The game was anything but fair. As described in the foregoing sections, Defendants structured the Tournament into small groups with small leaderboards to mislead Byran into believing he was outperforming his competitors and had a reasonable chance of advancing to the Finals, when, in reality, he was playing against thousands or even millions of other users and had, at best, an infinitesimal chance of advancing. Additionally, Byran was competing against cheaters, Super Users and offline users, all of whom had an unfair advantage. Defendants knew this, but failed to prevent it, disclose it, or to actively address it. And they did so to maximize the in-app purchases of honest users, all of whom have been victimized by Defendants' conduct.

FILED DATE: 2/21/2025 1:57 PM    20251105280

96.    Byran Bailey brings this action seeking an order finding Defendants liable for (1) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, (2) fraud, and (3) unjust enrichment.

<u>**COUNT I**</u>
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**

97.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Demand as though set forth fully herein.

98.    At all times relevant to this Demand, the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.* was in effect.

99.    ICFA, among other things, prohibits unfair or deceptive acts or practices, including, but not limited to, "misrepresentation or the concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact," or "the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act' (815 ILCS 505/2)," such as "conduct which . . . creates a likelihood of confusion or misunderstanding."  815 ILCS 510/2(12).

100.    At all times relevant hereto, Defendants were engaged in trade or commerce as defined under ICFA, 815 ILCS 505/1(f).

101.    Defendants engaged in deceptive acts and practices and conduct likely to cause confusion and misunderstanding when, in connection with the Tournament, Defendants knowingly, intentionally, and with intent to mislead, misrepresented to Plaintiff the number of competitors participating in and advancing to each stage of the Tournament, leading Plaintiff to believe he was outperforming the competition and had a reasonable chance of advancing in, and ultimately winning, the Tournament, when in fact, Plaintiff was competing against a significantly

FILED DATE: 2/21/2025 1:57 PM    20251105280

larger number of competitors.  On information and belief, Defendants made these
misrepresentations intentionally to incentivize Plaintiff to continue playing in the Tournament,
and spending money on in-app purchases during the Tournament, because had Plaintiff known
his true standing, he would not have spent money on in-app purchases under the belief that he
had a reasonable chance of winning a significant prize.

102.    Additionally, Defendants were aware that cheating was taking place during the
Tournament, yet failed to disclose it to Plaintiff and did nothing to stop it.  Defendants were also
aware that certain Super Users that had significant advantages were participating in the
Tournament, but failed to either suspend Super Users' enhanced abilities during the Tournament,
or disclose the existence of Super Users to Plaintiff or that Super Users would be permitted to
use their enhanced abilities during the Tournament.  And Defendants permitted certain players to
play "offline," obscuring their true performance in the Tournament, but failed to disclose to
Plaintiff the existence and prevalence of such players.  On information and belief, Defendants
knowingly, intentionally, and with intent to mislead concealed this information from Plaintiff,
because if Plaintiff had been aware that cheaters, Super Users, and offline players were permitted
to compete without consequence, Plaintiff would not have entered or continued playing in the
Tournament and spent significant amounts of money on in-app purchases.

103.    Defendants' representations and omissions concerning the Tournament were
material to a reasonable consumer, were designed to affect consumer decisions and conduct, and
were likely to deceive and cause misunderstanding.  Plaintiff reasonably relied on Defendants'
material misrepresentations and omissions in deciding to participate in, and spending significant
amounts of time and money in, the Tournament.  Plaintiff would not have participated in the
Tournament and made extensive in-app purchases absent Defendants' false and misleading

24

representations and omissions. At the very least, Plaintiff would have known exactly what he was paying for. Defendants robbed Plaintiff of this reasoned, informed choice.

104. Defendants' conduct in this regard was unfair in that it violated public policy, was immoral, unethical, oppressive, or unscrupulous, and caused substantial injury to consumers.

105. As a direct and proximate result of the foregoing unfair, fraudulent and deceptive acts and practices alleged herein, Plaintiff suffered actual damage when he devoted significant time and effort to the Tournament, made extensive in-app purchases during the Tournament, and provided Defendants substantial revenues, which he would not have absent Defendants' false and misleading representations and omissions.

106. Plaintiff is therefore entitled to relief, including actual damages, punitive damages, costs and attorneys' fees, under section 815 ICLS 505/10a of ICFA, in an amount to be determined at trial.

## COUNT II
### Fraud

107. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Demand as though set forth fully herein.

108. As set forth above, in connection with the Tournament, Defendants knowingly, intentionally, and with intent to mislead, misrepresented to Plaintiff the number of competitors participating in and advancing to each stage of the Tournament, leading Plaintiff to believe he was outperforming the competition and had a reasonable chance of advancing in, and ultimately winning, the Tournament when, in fact, Plaintiff was competing against a significantly larger number of competitors. On information and belief, Defendants made these misrepresentations intentionally to incentivize Plaintiff to continue playing in the Tournament, and spend money on

FILED DATE: 2/21/2025 1:57 PM    20251105280

FILED DATE: 2/21/2025 1:57 PM    20251105280

in-app purchases during the Tournament, because had Plaintiff known his true standing, he would not have spent money on in-app purchases under the belief that he had a reasonable chance of winning a significant prize.

109.    Additionally, Defendants were aware that cheating was taking place during the Tournament, yet failed to disclose it to Plaintiff and did nothing to stop it.  Defendants were also aware that certain Super Users that had significant advantages were participating in the Tournament, but failed to either suspend Super Users' enhanced abilities during the Tournament, or disclose to Plaintiff the existence of Super Users or that Super Users would be permitted to use their enhanced abilities during the Tournament.  And Defendants permitted certain players to play "offline," obscuring their true performance in the Tournament, but failed to disclose to Plaintiff the existence and prevalence of such players.  On information and belief, Defendants knowingly, intentionally, and with intent to mislead concealed this information from Plaintiff, because if Plaintiff had been aware that cheaters, Super Users, and offline players were permitted to compete without consequence, Plaintiff would not have entered or continued playing in the Tournament and spend significant amounts of money on in-app purchases.  Defendants had a duty to disclose this information, as Defendants' own actions created a misapprehension that the Tournament was fair, and Defendants deliberately failed to correct that misapprehension.

110.    Defendants' representations and omissions concerning the Tournament were material to a reasonable consumer and were designed to affect consumer decisions.  Plaintiff reasonably relied on Defendants' material misrepresentations and omissions in deciding to participate in, and spending significant amounts of time and money in, the Tournament.  Plaintiff would not have participated in the Tournament and made extensive in-app purchases absent Defendants' false and misleading representations and omissions.  At the very least, Plaintiff

FILED DATE: 2/21/2025 1:57 PM    20251105280

would have known exactly what he paid for.  Defendants robbed Plaintiff of this reasonable, informed choice.

111.    As a direct and proximate result of the foregoing representations and omissions alleged herein, Plaintiff suffered damages when he devoted significant time and effort to the Tournament, made extensive in-app purchases during the Tournament, and provided Defendants substantial revenues, which he would not have absent Defendants' false and misleading representations and omissions.

112.    Plaintiff seeks to recover the damages suffered, including actual and punitive damages, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT III
### Unjust Enrichment

113.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Demand as though set forth fully herein.

114.    Through the unfair, fraudulent, and deceptive acts described herein, Defendants induced Plaintiff to expend significant amounts of time, effort, and money in connection with the Tournament, including the making of extensive in-app purchases in connection with the Tournament.

115.    On information and belief, Defendants were enriched to the tune of millions—if not tens of millions—of dollars as a result of Plaintiff's and others' participation in the Tournament and making of extensive in-app purchases during the Tournament.  Defendants retained these benefits to the detriment of Plaintiff.

116.    Under the circumstances, Defendants' retention of these benefits violates the fundamental principles of justice, equity, and good conscience.

117. Plaintiff seeks to recover monetary damages and other relief as appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

    a. Find in favor of Plaintiff on all accounts asserted herein;

    b. Award damages, including compensatory, statutory, and punitive damages to Plaintiff in an amount to be determined at trial;

    c. Grant restitution to Plaintiff and require Defendants to disgorge their ill-gotten benefits;

    d. Award Plaintiff reasonable attorneys' fees and the costs and disbursements of this suit incurred herein;

    e. Award Plaintiff pre-judgement and post-judgment interest at the highest legal rate to the extent provided by law;

    f. Order any such other and further relief the Court deems just and equitable.

## **JURY DEMAND**

Pursuant to Illinois Supreme Court Rule 285, Plaintiff demands a trial by jury of twelve (12) on all counts herein and of all issues so triable.

FILED DATE: 2/21/2025 1:57 PM    20251105280

Dated: February 21, 2025

Respectfully submitted,

/s/ Akshay Soman
Martin W. Jaszczuk
Margaret M. Schuchardt
Akshay Soman
**JASZCZUK P.C.**
311 S. Wacker Drive, Suite 2150
Chicago, Illinois 60606
Telephone: (312) 442-0509
Facsimile: (312) 442-0519
mjaszczuk@jaszczuk.com
mschuchardt@jaszczuk.com
asoman@jaszczuk.com

*Attorneys for Plaintiff*

FILED DATE: 2/21/2025 1:57 PM   20251105280

# -EXHIBIT B-

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| Sorina Montoya, individually and on behalf of all others similarly situated, | ) ) | |
| | ) | |
| Plaintiff, | ) | No. |
| | ) | |
| v. | ) | Jury Trial Demanded |
| | ) | |
| King.com Limited, King Digital Entertainment PLC, and Activision Blizzard Inc., | ) ) | |
| | ) | |
| Defendants. | ) ) | |
| | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Sorina Montoya ("Plaintiff" or "Sorina"), individually and on behalf of all others similarly situated ("Class Members"), by and through her attorneys, Jaszczuk P.C., and for her complaint against Defendants King.com Limited ("King"), King Digital Entertainment PLC ("King Digital") and Activision Blizzard, Inc. ("Activision," and together with King and King Digital, "Defendants") states as follows:

## INTRODUCTION

1.      On March 23, 2023, Defendants launched Candy Crush All Stars 2023, a mobile gaming contest based on the popular Candy Crush application.  Promising $250,000 in prizes and an expense-paid trip to London for 10 finalists, Defendants sought to entice gamers to enter the competition and put their skills to the test against other players around the world.  All in good fun.  Or was it?

2.      As it turns out, behind the bright colors, adorable icons and happy music—all of which serve to entertain users and to keep them coming back—there is another aspect to the

1

game.  An aspect that does not serve users but, instead, serves Defendants: the option for users to purchase a variety of intangible items, such as extra lives and boosters, that benefit players in the game.

3.      In short, Defendants give players the option to use the money they earned in the real world, which could be used to purchase milk, bus rides, or staplers, to instead purchase extra lives, color bombs, lollipop hammers, and extra moves – all of which help players be more successful playing Candy Crush.

4.      And that is, largely, how Defendants earn money.  Quite a bit of it, in fact.  In 2014, Candy Crush users reportedly spent over $1.3 billion on in-app purchases.[1]

5.      But Defendants have a problem.  The vast majority of players decline the invitation to trade real dollars for intangible inventions.[2]  And so, Defendants must come up with new ways to entice more users to spend money and to spend more of it.

6.      Enter Candy Crush All Stars 2023 (the "Tournament").

7.      With $250,000 in prizes and an expense-paid trip to London on the line, Candy Crush players were presented with plenty of incentive to show up, enter the Tournament and spend their money on a variety of boosters and extra lives to help them beat their fellow competitors to one of the ten available golden tickets to London.

8.      And show up they did.  In droves.  Some users have estimated that over one million players advanced to the "Semi Finals."[3]  And all these players, faced with the allure of a six-figure grand prize and a trip to England, were well incentivized to spend their funds on in-

---

[1] https://www.theguardian.com/technology/2015/feb/13/candy-crush-saga-players-855m-2014.
[2] *Id.*
[3] Excerpt from Candy Crush Reddit Forum,
https://www.reddit.com/r/candycrush/comments/12wto6j/over_1000000_in_the_semi_finals_of_all_stars/

app purchases.

9.    There is, perhaps, a debate to be had about the interplay between such incentives, companies' profit-making motives, and personal choice. But such philosophical and political discussions are beyond the scope of this Complaint.

10.    Instead, this Complaint is focused on one key proposition: consumers are entitled to be presented with the information they will need to make an informed decision about whether to spend their funds on in-app purchases. And this is where Defendants' conduct fell short. Woefully short.

11.    Specifically, Defendants failed to inform Plaintiff and Class Members, and in some instances actively misrepresented, four key pieces of information: (1) the number of players advancing through each Tournament stage, (2) that some competitors gain an unfair advantage by cheating, (3) that some competitors have an unfair advantage because they have unlocked game modes that give them enhanced abilities ("Super Users"), and (4) that some users can play offline, which masks their running scores.

12.    _Number of Players_ – While Defendants have not released exact numbers, it appears that well over one million players took part in the Tournament. And Defendants stood to profit handsomely if they could convince a significant proportion of these players to make in-app purchases in an effort to finish in the top ten on the Tournament leaderboard. But Defendants knew that a player who recognizes that she is currently number 27,412 on the leaderboard will be unlikely to spend significant funds on in-app purchases. So, at each stage of the Tournament, Defendants placed contestants into artificially small groups of no more than 50 players, and used terms such as "Quarter Finals" and "Semi Finals," to manipulate users into thinking that they were doing well against their peers and were getting close to the 10 coveted London spots. On

3

information and belief, this tactic worked wonderfully—from a fiscal perspective—for Defendants. Players in small groups spent dearly to outcompete others, thinking that they had a legitimate chance of advancing further, if they could only win their particular pool. This was unadulterated deception.

13. <u>Cheaters</u> – Within days of the Tournament's start, Candy Crush-related bulletin boards lit up with Tournament contestants complaining about rampant cheating. There are a plethora of examples. Suffice it to say, Defendants were well aware that cheating was highly probable, but failed to put proper measures in place to prevent cheating and failed to adequately deal with cheaters once the Tournament began. This put honest players at a significant disadvantage and caused honest players to spend more money on in-app purchases trying to beat the cheaters. It also caused honest players to enter the Tournament to begin with, which many would not have done had they known that they would be competing with cheaters.

14. <u>Super Users</u> – Some players have played Candy Crush for so long and have gotten so far in the game that they have earned in-app abilities that are not available to mere mortals – they become "Super Users." When Super Users play Candy Crush, their powers (*e.g.*, ability to choose which board to play) make it significantly easier for them to score points. Player commentary available online indicates that a number of Super Users took part in the Tournament and, unsurprisingly, easily beat their competitors. Defendants failed to disclose to Plaintiff and Class Members both the existence of Super Users and that Super Users would be permitted to take part in the Tournament with their super powers unchecked. This had the intended effect of misleading Plaintiff and Class Members into thinking they had a fair chance of competing and caused them to spend money on in-app purchases they otherwise would not have spent.

4

15.     _Offline Players_ – While playing the Tournament, players are shown a live leaderboard that informs them of their current standing.  Players use their standing to make a reasoned determination about the benefit of in-app purchases.  For instance, a player ranked #35 in a pool of 50 players may decide that paying for boosters is not a sound financial proposition, while a player ranked #3 might determine that paying a few hundred dollars to get to first place is a good bargain.  But a player can only make a reasoned choice if she has an accurate gauge of where she stands.  And, as it turns out, Defendants misled Plaintiff and Class Members on this account as well.  Specifically, Defendants permitted players to play "offline" at times.  During these periods, the offline players were earning significant points, whereas their scores on the official leaderboard appeared unchanged.  Then, with minutes left in the game, the offline players came back online and leapfrogged over Plaintiff and Class Members who, all along, were making their purchasing decisions based on their perceived standing on the leaderboard.  By failing to disclose the existence and prevalence of offline players, Defendants caused Plaintiff and Class Members to make in-app purchases they otherwise would not have made had they known their true standing on the leaderboard.

16.     In all, Defendants' actions in misrepresenting and concealing the number of players in the competition, and the existence of cheaters, Super Users and offline players, had the effect of causing Plaintiff and Class Members to overestimate their chances of success, which in turn had the intended effect of causing Plaintiff and Class Members to spend significant sums on in-app purchases that they otherwise would not have spent.

17.     Accordingly, Plaintiff brings this action to remedy Defendants' deceptive conduct in connection with Defendants' operation of the Tournament.  Defendants induced Plaintiff and Class Members to participate in the Tournament—and spend countless hours of time on the

game and untold amounts of money on in-app purchases—with the promise of a fair chance at winning a share of a $250,000 grand prize. In reality, however, the Tournament was administered by Defendants in a deceptive manner that tricked players into believing they were performing better in comparison to other players than they actually were, and the competition was riddled with cheating and other conduct that severely decreased Plaintiff's and Class Members' chances of winning, which Defendants knew but failed to remedy. Plaintiff brings this action for violations of Virginia's consumer protection statute, as well as unjust enrichment and fraud.

## **PARTIES**

18.     Plaintiff Sorina Montoya is an individual who resides in North Chesterfield, Virginia.

19.     Defendant King.com Limited is a Malta corporation with its principal place of business in St. Julian's, Malta.

20.     Defendant King Digital Entertainment PLC is an Ireland corporation with its principal place of business in Dublin, Ireland.

21.     Defendant Activision Blizzard, Inc. is a Delaware corporation with its principal place of business in Santa Monica, California. Activision is the parent corporation of Defendants King and King Digital. But Activision was not simply a corporate parent bystander here. To the contrary, Activision affirmatively marketed the Tournament with the intent of enticing players to participate.

22.     On March 20, 2023, Activision posted on its corporate website a press release titled: "It's Giving 'ICY GRL'! Saweetie Teams Up with Candy Crush Saga to Reveal First-Ever $250,000 Cash Prize Pot and Limited-Edition Championship Rings for 2023 All Stars Final

6

Winners."[4]

23.     The press release, which prominently features the Activision Blizzard logo in large print at the very top of the page, informs consumers that if they enter the Tournament, they could live life like a renowned athlete and have "stacks of cash": "Ever dreamt of living the life of an internationally renowned athlete - earning stacks of cash, an All Stars win under your belt, and a blinged out championship ring to prove it? Well now is your chance."[5]

24.     The press release goes on to tempt potential players with championship rings, a trip to London, and the chance to share in $250,000 in prize money: "For the first time ever, Candy Crush Saga is rewarding its All Stars tournament winners with three championship rings worth $75,000 in total, designed by Atlanta-based jeweler, Icebox. The fierce competition kicks off this Thursday, March 23 when players can compete in-game for an invitation to the live final in London, and a chance to take home a share of the $250,000 prize pot and the championship rings."[6]

25.     To complete the enticement, Activision alerted potential participants to the exclusivity of the custom-designed rings, which can only be obtained by entering the Tournament and earning a spot in the finals: "The championship rings are so exclusive, not even 'ICY GRL' herself Saweetie could swipe one . . . The only way anyone - even GRAMMY Award Nominated rappers - can get hold of these rings is to Crush their way to a spot in the

---

[4] Press Release, Activism Blizzard, It's Giving 'ICY GRL'! Saweetie Teams Up with Candy Crush Saga to Reveal First-Ever $250,000 Cash Prize Pot and Limited-Edition Championship Rings for 2023 All Stars Final Winners (Mar. 20, 2023), https://www.prnewswire.com/news-releases/its-giving-icy-grl-saweetie-teams-up-with-candy-crush-saga-to-reveal-first-ever-250-000-cash-prize-pot-and-limited-edition-championship-rings-for-2023-all-stars-final-winners-301775707.html. A copy of this press release is attached hereto as Exhibit A.
[5] *Id.*
[6] *Id.*

Final."[7]

26.     Activision's attempts to drive participation were apparently highly successful, as over one million players took part in the Tournament.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this matter pursuant 28 U.S.C. § 1332(d), because (a) at least one member of the putative classes is a citizen of a State and at least one of the Defendants is a citizen or subject of a foreign state; (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action.  Approximately 250 million individuals play Candy Crush, and over one million individuals participated in the Tournament.  On information and belief, Defendants have injured hundreds of thousands, if not millions, of individuals in the United States by inducing them to participate in an unfair and deceptive competition that resulted in each of them spending hundreds, if not thousands, of dollars to participate, as in the case of Plaintiff, who spent in excess of $3,000 over the course of the Tournament.  Accordingly, the amount in controversy easily exceeds $5,000,000.

28.     Venue is proper in the District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

29.     In the past ten years, mobile gaming has become ubiquitous in American society. Whereas twenty years ago consumers were limited to rudimentary games, the advent of smart

---

[7] *Id.*

8

phones and—perhaps more importantly—technology that allows consumers to seamlessly make in-app purchases, has led to an explosion in the market for mobile gaming.

30.     There is also, however, a dark side to the mobile gaming craze – the games can be extremely addictive and financially ruinous.[8]  And in many cases the addictiveness of the games is by design, as mobile gaming companies make more money if consumers spend more time gaming and, critically, making in-app purchases.

31.     One of the pioneers of this business model is Defendant King, which developed the wildly popular game, Candy Crush Saga.[9]

32.     King launched Candy Crush Saga as a mobile game available on iOS in 2012. Almost immediately after its release, Candy Crush Saga became one of the most popular and profitable mobile games on the market.[10]

33.     From 2012 to 2013, the first year Candy Crush Saga was available for iOS, King's revenue increased 1084%.[11]

34.     In large part as a result of Candy Crush Saga's success, King was able to go public in 2013, and was subsequently acquired by Defendant Activision Blizzard for $5.9 billion in 2016.

35.     In the period 2013 through 2017, Candy Crush Saga was consistently the first or second most popular mobile game on the market.[12]

---

[8] Addictions Content Team, *A New Addiction on the Rise: Mobile Game Addiction*, ADDICTIONS (July 7, 2021), https://www.addictions.com/blog/a-new-addiction-on-the-rise-mobile-game-addiction/.
[9] *Id. See also* Eliana Dockterman, *Candy Crush Saga: The Science Behind Our Addiction*, TIME (Nov. 15, 2013), http://business.time.com/2013/11/15/candy-crush-saga-the-science-behind-our-addiction.
[10] David Curry, *Candy Crush Revenue and Usage Statistics (2023)*, BUSINESSOFAPPS (Jan 9, 2023), https://www.businessofapps.com/data/candy-crush-statistics/.
[11] *Id.*
[12] *Id.*

36.     The game's popularity has hardly waned.  In 2022, 138 million users downloaded Candy Crush Saga from the iOS app store and Google Play.[13]  And in 2021, Candy Crush Saga generated over $1 billion in revenue.[14]

**THE CANDY CRUSH GAME**

37.     Candy Crush is a match-making puzzle game.  Users—who can play the game on both iPhones and Android devices—attempt to "crush" candies by matching three or more of the same candy icons in consecutive order, thus clearing them from the game board.

38.     Each game starts with a fresh game board, for which users are assigned a specific goal, such as accumulating a given number of points (which are earned by crushing candies).  But users are given a limited number of moves or turns to reach the given goal.

39.     If a user fails to accomplish the goal within the given number of turns, she loses a life ("Life" or "Lives") and must start the board over again.

40.     Players are only afforded five Lives at the outset of the game.  Once users lose those five Lives, they must wait thirty minutes for a new Life to regenerate before they can play again.

41.     But waiting is not the only option.  Users who want to continue playing without waiting 30 minutes are given the option of purchasing more Lives, which then permit them to continue playing immediately.

42.     And thus enters the true point of the game—at least from Defendants' perspective—the in-app purchases by which Defendants earn revenue.

---

[13] Jordan Bevan, *Candy Crush Saga Revenue and Usage Statistics*, MOBILE MARKETING READS (Jan. 11, 2023), https://mobilemarketingreads.com/candy-crush-saga-revenue-and-usage-statistics-2020/.
[14] *Id.*

43.     Since the game's first inception, Defendants have created a variety of in-app purchases to entice gamers to spend money.  In addition to buying Lives, users can purchase a variety of boosters, such as lollipop hammers, extra moves, free switches, and UFOs, all of which enable players to increase their scores or otherwise "crush" candies more effectively.

## THE CANDY CRUSH ALL STARS 2023 TOURNAMENT

44.     In 2021, Defendants generated over $1 billion in revenue from Candy Crush Saga, a significant portion of which derived from in-app purchases.[15]

45.     While this number seems astounding for a simple mobile game, more surprising is that this revenue was generated from a very small proportion of players, as the vast majority of users do not spend money on the app and play for free.[16]

46.     As such, even though Candy Crush Saga is already a smashing financial success, from a corporate perspective there is a significant untapped supply of free riders who can potentially be induced to become paying users.

47.     But how best to do so?

48.     Enter Candy Crush All Stars 2023.

49.     Defendants billed the Tournament as the "sweetest and biggest tournament of the year."[17]

---

[15] *Id.*
[16] Stuart Dredge, *Candy Crush Saga players spent £865m on the game in 2014 alone*, THE GUARDIAN (Feb. 15, 2015, 6:45 AM EST) https://www.theguardian.com/technology/2015/feb/13/candy-crush-saga-players-855m-2014.
[17] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/349656/%EF%BB%BFall-stars-the-sweetest-and-biggest-candy-crush-saga-tournament-of-the-year/p1.

50.     Prizes included a share of $250,000, a trip to London for the Tournament final for ten finalists, and customized Candy Crush Saga-inspired championship rings with a combined value of over $72,900.[18]

51.     Tournament competitors were tasked with collecting special purple star shaped candies and ostensibly could track their score and rank relative to other players on a leaderboard.

52.     The Tournament was divided into nine separate stages, beginning with qualifier rounds and eventually progressing to Quarter Finals and three stages billed as Semi Final 1, Semi Final 2, and Semi Final 3, followed by the Final in London, England.

53.     At each stage, users' scores were displayed on Tournament leaderboards with up to 50 contestants, and competitors were required to place at or above a certain rank in their given leaderboard to qualify for the next round.

54.     In total, 10 players would qualify for the Final.  But, other than the Final, Defendants did not specify how many individuals would qualify for each successive Stage.

55.     The Tournament commenced on March 23.

56.     As promoters and financial beneficiaries of the Tournament, Defendants had an obligation to users to ensure that the Tournament was structured and overseen in a manner that ensured a baseline level of integrity, transparency, and fairness.

57.     But soon after the Tournament commenced, it became clear that the contest Defendants had billed as "an exciting competitive tournament"[19] was in reality more akin to a scam.

---

[18] Lewis Rees, *Candy Crush Saga breaks records with All Stars Tournament*, POCKET GAMER (Mar. 20, 2023), https://www.pocketgamer.biz/news/81104/candy-crush-saga-breaks-records-with-all-stars-tournament/.
[19] *Supra*, excerpt from King Community Forum, at n.17.

58.     Specifically, Defendants structured the Tournament in a deceptive manner to create a false impression that players' odds of qualifying for the Final were higher than they actually were.  The reason was monetary – obscuring users' true odds of winning kept them invested in the Tournament, and more importantly, kept them spending money on in-app purchases.

59.     Defendants did so in at least four ways:

60.     *First*, Defendants deceived Plaintiff and Class Members as to the number of competitors and, concomitantly, the true chances of making the Final round.

61.     Defendants segmented the Tournament into nine stages, from which a certain number of users would qualify for each successive stage.  To qualify, players had to attain a specified rank within a Tournament leaderboard group that included up to 50 players.

62.     But other than indicating that there would be 10 finalists, Defendants never informed Plaintiff and Class Members how many other players were taking part in the competition.  To the contrary, Defendants did what they could to mislead contestants into thinking that they were doing well vis-à-vis their competitors, that there were few other players against whom they were competing, and that they had a good chance of making the Finals in London.  That kept Plaintiff and Class Members spending money on in-app purchases.

63.     For instance, Defendants never provided an aggregate leaderboard or any other information that accurately represented how many competitors were still in the Tournament.  Instead, Defendants placed gamers into small Tournament leaderboard groups of 50, which ensured that contestants were only able to gauge their performance against a statistically insignificant number of competitors.  More importantly, it kept Plaintiff and Class Members incentivized to spend money on in-app purchases.  After all, a contestant who thinks that she is

13

#6 in her group of 50 is far more likely to spend money on in-app purchases than a contestant who can see that she is in position #126,456 out of 1 million.

64.    Defendants paired this deceptive small-group structure with misleading stage names to make contestants believe that they were approaching the Finals.  To that end, Defendants used terms such as "Quarter Finals" and "Semi Finals," terms that are commonly understood to mean that competitors are one and two stages, respectively, from the Finals (and are typically also indicative of a stage in the contest where there are only eight and four competitors remaining).

65.    That was far from reality.  Some players have estimated that over one million players advanced to the "Semi Finals."[20]

# Over 1.000.000 in the "Semi Finals" of All Stars

I think we all know by now that Candy Crush All Stars is/was a scam. Giving you hope and the feeling that you are so close to the final with a trip to London, that the "investment" is worth it.
It's not, and it never was.

Doing the math, in the three rounds of the semi finals, only 1:50 progressed each. So for each of the 10 finalists, there are 50 in the last round of the semifinals, 50 times 50 in the second round and 50 times 50 times 50 in the first round of the semi finals.

In other words: 1.250.000 players progressed into the "Semi Finals". This wording gave each a feeling of chance, that there is a possibility to win a trip to London. But if you know, that there is a million others against you and getting points is more about spending money than skill, would you continue to participate?

---

[20] *Supra*, Excerpt from Candy Crush Reddit Forum, n.3.

66.     Defendants' decision to place contestants into small leaderboard groups and to use misleading stage names created a false impression that was designed by Defendants to increase in-app spending.

67.     One competitor summed it up fairly succinctly:[21]



April 19

I have been really saddened by reading so many players have spent so much of their money on All Stars.

Those of us with years of experience and some mathematical knowhow have tried from the outset to warn others that there are millions competing in the semi finals and that only the madly obsessed non stop players or cheaters stand a chance of winning. Why have so many people been duped into believing they could win? It's not your fault: King have deliberately kept the number of competitors secret, introduced so many wild card rounds and chances to make it really easy for anyone to qualify for the semi finals. The term "semi final" was misleading to a huge degree, making people think they were anywhere near the final, like it is in the world cup. The whole tournament is designed to mislead players into spending money for what was essentially a lottery.

Ah yes, and everyone who filled out the contact form will get lots of spam soon because the data is sold to third parties.

⚑ Flag   ❝ Reply   ♡ 4 Helpful   👍 1 Sweet   ❤ 2 Love   😄 1 Haha

68.     Another Competitor revealed that, after everything was said and done, he had spent more money on in-app purchases during the Tournament than it would have cost him to simply purchase a plane ticket and accommodations in London:[22]

---

[21] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/401713/all-stars-was-it-really-worth-it/p1.
[22] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/comment/2614682#Comment_2614682.



April 19

All I can say is " we are in the same boat ". I put 3 credit cards in my Auto Payment. After 4 days straight of playing CCSaga All Stars, I am now owing my credit cards, more than the total amount of the R/T tickets to London + hotel accommodation. It felt like I was possessed when I was playing it that I did not mind about the bills I would incur after the tournament.

⚑ Flag   ❝ Reply   ♥ Helpful   👍 1 Sweet   ❤ 1 Love   😄 1 Haha

69.     The dismay expressed by the foregoing user, and the financial harm he has suffered, were both directly caused by Defendants' deceptive conduct.  There is more.

70.     *Second*, Defendants failed to disclose the existence of, and failed to properly deal with, cheaters.

71.     When Plaintiff and Class Members agreed to participate in the Tournament and to spend time and money competing, they did so with the expectation that the competition would be fair.

72.     It was anything but.

73.     As the Tournament progressed, user complaints documenting suspicious activity and Defendants' indifference to those concerns quickly began surfacing on Defendants' own forum.[23]

---

[23] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/comment/2616175#Comment_2616175; https://community.king.com/en/candy-crush-saga/discussion/comment/2617209#Comment_2617209.



April 20

Totally agree with you. I started the competition as soon as the second semi-final was launched. When my scoreboard opened after my first game, the first players were already over 30,000 points! I took screenshots to monitor the scores and the time elapsed. In 5 minutes, I won 15/20,000 points maximum, they won 200,000! How is it possible ?!

Either they are bots and therefore impossible to beat, or they are real players who cheat or are favored by King. I won all my games, my races of champions, I never managed to integrate the top 10 of my table so much the scores increased quickly. I gave up after 6 hours when they reached 1 million points (how is that possible?!) when I was barely at 400,000.

This morning when opening the game (I'm in France, it's barely 9:30 am here) the first players reached 3 million points. I have played enough to know that it is impossible to reach such a score even without taking a break. There is therefore cheating and/or rigging of scores.

⚑ Flag   ❝ Reply   ♀ 2 Helpful   👍 Sweet   ❤ 5 Love   😄 Haha



April 20

So I found out they can play this game on a phone and change the time ahead on their phone and it'll allow them to start earlier and if they are offline the system won't catch it . I watched the countdown and literally a second after it started some guy was at 500k so I put some money into it and lots and lots of time and he stayed a good 500k ahead every second all the way to the last second

⚑ Flag   ❝ Reply   ♀ Helpful   👍 Sweet   ❤ Love   😄 1 Haha

74.     Properly investigating reports of cheating or implementing systems to prevent it at the scale needed for the Tournament would have decreased the profitability of the Tournament. So instead, Defendants either failed to investigate reports of cheating or, in some cases, did a cursory review and followed up with vague non-committal statements.

75.     And that put honest players at a significant disadvantage and caused Plaintiff and Class Members to spend money on in-app purchases they otherwise would not have spent.

76.     *Third*, Defendants failed to disclose the existence of Super Users.

17

77.     When Plaintiff and Class Members entered the Tournament, they believed they had a fair chance of competing against other players.  Not so.  As it turns out, without providing any disclosure, Defendants permitted entry into the Tournament to individuals who had previously completed all of the 14,018 Candy Crush Saga boards – let's call them "Super Users."

78.     Players who complete all available 14,018 Candy Crush Saga boards are given access to a Star Tournament ("ST") (not to be confused with the Candy Crush All Stars 2023 Tournament).

79.     Once Super Users have reached the ST level, they are provided with access to game boards that are not available to ordinary users.  Some of these game boards provide point multipliers of up to 30x or more, which provide Super Users with the ability to score points at an extraordinary pace that ordinary users cannot match.

80.     One such Super User who took part in the Tournament posted an explanation on a Candy Crush-related message board:[24]

---

[24] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/402853/ten-million-points-in-59-minutes-explained/p1

I've been playing for 59 minutes now and have scored 10,008, 980. I have to stop, a client requires my attention.

Later.

O course, 10 million points does not equate to 10 million purple stars that were in the All Stars Tournament, but it is an indicator, bearing in mind the x30 multiplier would have been applied, of the potential stars I might have won in these 59 minutes of play.

I could have played on for another hour or more on that one level/game. In the semi finals I used the points gained as my guide and the greatest number I attained was 25 million before choosing to end that game. To other players it may have looked that I was a bot, suddenly appearing on the leader board with a very high number of purple stars, when, in fact, I was online, playing one good board in the Star Tournament.

I ended games so that other players could get a sense of my score and because I felt out of touch with the leader board. I was neck and neck with the player in second place for most of the night and they also *appeared* to me to be offline at times. They *may* have been doing exactly what I was doing. This was the only real element of fun – the rest of the experience was gruelling but it demanded commitment.

This is my explanation.

My score is totally dependent on my use of boosters that I have built up over 10 years. There is a cascade effect by using the combination of a colour bomb and hammer/pink lollipop. Creating lots of colour bombs and then exploding one which sets off a chain reaction. At one stage in the 3rd semi final the game played itself for 10 minutes and generated *loads* of very welcome points.

⚑ Flag   🔖 Reply   💡 2 Helpful   👍 Sweet   ❤ Love   😀 1 Haha

81.     Perhaps most interestingly, this Super User, while noting that his technique was legitimate as it was created by King, admitted that playing the Tournament as he did—with the 30x point multiplier that is available to Super Users but not to ordinary contestants—was "not really within the *spirit* of the game."  When another competitor said it was unfair, he responded: "It isn't fair.  I agree with you."[25]

---

[25] Excerpts from King Community Forum, *id.*; https://community.king.com/en/candy-crush-saga/discussion/402853/ten-million-points-in-59-minutes-explained/p3.

19



I agree. My strategy works but it is not really within the *spirit* of the game. It is totally legitimate. King created it and added the x30 multiplier.

The problem is that players who have completed all available levels have two choices, they replay levels they have already completed *outside of The Star Tournament* environment where the x30 multiplier does not apply or they play *in* The Star Tournament where the x30 multiplier does apply. To complete in All Stars 2023 there is, therefore, only one real option: The Star Tournament.

The cascade effect has to be set up by using the hand booster to create colour bombs all over the board. I created 15 and then bashed one with a hammer/pink lollipop - fireworks erupt and more and more colour bombs are spawned and set off. It's a joy to watch - sometimes a little unnerving.

🚩 Flag    🔖 Reply    ♀ 2 Helpful    👍 Sweet    💚 Love    😄 Haha



It isn't fair, I agree with you. You say "*No offence but this is pay to win contest...*" I did not pay for the boosters. I earned them gradually over 10 years. It is likely, though not yet confoirmed, that finalists will be given a device with no boosters on it which is heading towards a fairer starting point.

🚩 Flag    🔖 Reply    ♀ 1 Helpful    👍 Sweet    💚 Love    😄 1 Haha

82.     To be clear, this Complaint does not place blame on this particular Super User, or any other Super Users for that matter.  Super Users are not at fault for reaching the end of the game and being rewarded, by Defendant King, with super powers.  The fault here lies entirely with Defendants, who failed to either (a) limit the abilities of Super Users to ensure a level playing field, or (b) disclose to Plaintiff and to Class Members that they would be competing against Super Users, who had available to them in-game abilities that, for all intents and purposes, would make them virtually unbeatable by ordinary users.

83.     Had they known this fact, Plaintiff and Class Members would not have made the in-app purchases they made throughout the Tournament.

84.     One competitor—without Super User abilities—aptly summarized the point as follows:[26]



April 28

For me, you are not a fraudster. You simply use your collected boosters. Unfortunately, you have an advantage (like other players): You play star event and can choose a good point level within a certain framework. I can't do that. With the same number of boosters used, you have of course collected much more purple stars. For us normal players, there is no chance to win. That's not a reproach against you because you can't do anything about it. If I repeat the semi-finals, I will therefore not waste any more money and only play normally and have fun. That's what the game is for. Good luck in the final if you're there 😊 👍

⚑ Flag   ❝ Reply   ♡ Helpful   👍 2 Sweet   ❤ Love   😊 1 Haha

---

[26] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/402853/ten-million-points-in-59-minutes-explained/p2.



85.     *Fourth*, Defendants failed to disclose the existence of Offline Players.

86.     Grouping players into artificially small groups, with no more than 50 on any given leaderboard was, as discussed above, patently misleading.  But that was not the only problem with the leaderboards.  A second issue is that they were inaccurate.

87.     Specifically, Defendants permitted players in the Tournament to play offline, meaning that certain players would be playing the game and accumulating points, but their true point totals would not be visible to Plaintiff and Class Members in the same group until they came back online.

88.     The problem with this maneuver is that Plaintiff and Class Members made their in-app purchasing decisions based on how they were doing vis-à-vis their competitors.  For instance, a player in third place may decide to spend money on boosters in an attempt to finish first, while a player in 12th place may decide to forego the same purchase.  The problem with offline players is that their true score is inaccurate while they are offline, thereby giving Plaintiff and Class Members a misleading view of their standing on the leaderboard and an incentive to make in-app purchases that they otherwise may not be inclined to make.

89.     A number of Tournament competitors complained about this issue, pointing out how some offline players logged back in with minutes to spare and leapfrogged the competition:[27]



April 25

It is sad that there were so many offline dubious players maki g points that would be impossible to make. Too bad they didn't get grouped together themselves since they wait until last minute to see who guessed which impossible was going to win lol. It is sad that it looks like from how rampant this is is, no honest players are making it. I have not touched the game since I found out & learned my lesson.

⚑ Flag   ❝ Reply   ♡ Helpful   👍 Sweet   ♥ Love   😀 Haha

But this N1 position wasnt even in the top 6 2:51 minutes earlier: (So this means that player was playing offline making millions of pts (at least 6.8MM in the last 2:51 minutes of play)



---

[27] Excerpts from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/comment/2622023#Comment_2622023; https://community.king.com/en/candy-crush-saga/discussion/comment/2620238#Comment_2620238.

90. Defendants failed to disclose to Plaintiff and Class Members that they would be competing against offline users and that the leaderboard totals presented to them might be false. This failure caused Plaintiff and Class Members to believe that they were performing better relative to other users than they actually were. This, in turn, caused Plaintiff and Class Members to spend money on in-app purchases they otherwise would not have spent had they known their true standing.

91. Each and every one of Defendants' above-described misrepresentations and omissions occurred every time Plaintiff and Class Members viewed their scores on a leaderboard that (1) misrepresented the number of competitors against whom Plaintiff and Class Members were playing and their true standing in the Tournament; (2) failed to disclose that other competitors in the Tournament were cheating; (3) failed to disclose that other competitors in the Tournament were "Super Users"; and (4) failed to disclose that other competitors in the Tournament were competing offline.

**S**ORINA **M**ONTOYA'S **O**RDEAL

92. Plaintiff, Sorina Montoya, is a wife and the mother of two young boys and resides in North Chesterfield, Virginia.

93. Sorina first downloaded the Candy Crush app in approximately 2012, and typically likes to play in the evenings after the day's duties are done and the kids have been put to bed.

94. In all the years she has had the app, and until she began playing in the Tournament, Sorina rarely spent money on in-app purchases.

95. All that changed when the Tournament began.

96. Sorina started playing in the Tournament on March 23 and March 25, 2023—

24

during the qualifying rounds—by accident, having simply logged in to play a game of Candy Crush.

97.     It appears that Sorina was successful in this initial round, and when she logged into the Candy Crush app on April 7, the screen she encountered was not the one she was used to seeing.  Instead of the regular starting screen, Sorina was presented with the Tournament screen, which indicated, "Incredible Prizes are waiting to be won!" and provided her with only one option – to tap the "Let's go" button to begin the All Stars Tournament.

98.     So she did.  And so began a journey that Sorina will never forget, as much as she would like to.

99.     Sorina played for a few hours that evening and, by the end of night, realized that she was doing quite well in what Defendants called the Quarter Final round, which ran from Friday, April 7 through Tuesday, April 11.

100.     Having done well on her first day, Sorina kept playing on Saturday night and kept checking the leaderboard, which indicated that she had a good chance of winning if she only kept playing and if she made in-app purchases to boost her chances.  So she did – she kept playing deep into the night and started purchasing extra lives and boosters.  And she continued on Sunday.  And on Monday.  And on Tuesday.  By the time the Quarter Finals had concluded on April 11, Sorina had devoted more than 20 hours to the game and had spent over $50 purchasing boosters.  And, as it turned out, she had advanced.

101.     The first round of the Semi Finals was scheduled to begin on April 15 and to run through April 18.  Sorina began playing on the evening of Saturday, April 15, and played deep into Sunday morning before exhaustion carried her to sleep.  On Sunday, she woke up, went to church with her family, came home, and got right back to playing.

25

102.    Having found something she was good at, and wanting to make her family proud, she kept playing.  From mid-afternoon on Sunday, deep into the night and into early Monday morning, Sorina kept playing and kept making dozens of in-app purchases.  She continued on Monday and on Tuesday.  By the time this round ended on the evening of Tuesday, April 18, Sorina had spent around 40 hours and about $1000 on in-app purchases in this round alone.

103.    Next came the second round of the semi-finals, which ran from Wednesday, April 19, through Thursday, April 20.  It took almost 20 hours and about another $1000, but Sorina managed to advance again.

104.    By this point, the game had consumed her life.  It was no longer fun.  She was taking days off work.  Her husband was coming home early to take care of the kids.  And when her son got hurt and needed to go to the hospital, dad had to take him – Sorina had to keep playing.  Having invested about 80 hours and $2,000 getting to this point, and wanting to at least get her money back, Sorina couldn't abandon the game now.  She needed to keep going.

105.    The end came at about 4:00 p.m. on Friday, April 21.  Unable to keep up with the players in front of her no matter how much time she dedicated and how much money she spent (including over $1000 on April 21 alone), it was time for Sorina to face her family and explain that she could not make them proud.  In fact, she had spent a sum of money that was very significant to her family chasing an empty dream.

106.    In total, Sorina had spent over $3,000 and close to 100 hours on the Tournament, enticed by Defendants with the idea of winning $100,000 and a trip to London playing what she had thought was a fair game.

107.    And perhaps we could blame Sorina, and the millions of people like her who did the same, if the game had been fair.  We could say that adults should not allow themselves to be

26

led astray by sleek corporate marketing and clever corporate machinations designed to draw players into a game where they need to spend their wages on color bombs and lollipop hammers. After all, if a corporation can convince people that they should exchange their money earned in the real world for intangible thingamajigs in the cyber world, then people have only themselves to blame.  Perhaps.

108.    But whatever side of this debate one may choose to take, one point is beyond dispute: the game has to be fair and players must be given the information they need in order to make a reasoned decision as to whether to spend their money on such items.  And that's where things broke down.

109.    The game was anything but fair.  As described in the foregoing sections, Defendants structured the Tournament into small groups with small leaderboards to mislead Sorina and Class Members into believing they were outperforming their competitors and had a reasonable chance of advancing to the Finals, when in reality they were playing against thousands or even millions of other users and had, at best, an infinitesimal chance of advancing. Additionally, Sorina and Class Members were competing against cheaters, Super Users and Offline users, all of whom had an unfair advantage.  Defendants knew this, but failed to disclose it, or to actively address it.  And they did so to maximize the in-app purchases of honest users, all of whom have been victimized by Defendants' conduct.

110.    On behalf of herself and all others similarly situated, Sorina Montoya brings this class action against the Defendants seeking a full refund of all monies spent on in-app purchases during the Tournament and for all other relief ordered by this Court.

## CLASS ALLEGATIONS

111.    Plaintiff brings this action on behalf of herself and as a class action pursuant to

the provisions of Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf

of classes and subclasses defined as follows:

> **Nationwide Class**
> All individuals in the United States who participated in the Candy Crush All Stars
> 2023 Tournament.
>
> > **Nationwide Subclass**
> > All individuals in the United States who participated in the Candy Crush
> > All Stars 2023 Tournament and made in-app purchases.
>
> **Virginia Class**
> All individuals residing in Virginia who participated in the Candy Crush All Stars
> 2023 Tournament.
>
> > **Virginia Subclass**
> > All individuals residing in Virginia who participated in the Candy Crush
> > All Stars 2023 Tournament and made in-app purchases.

112.    References to the "Class," "Classes," and "Class Members" refer to all of the

above stated Classes and Subclasses, unless otherwise indicated.

113.    Excluded from the Classes are Defendants and their subsidiaries and affiliates; all

persons who make a timely election to be excluded from the Classes; governmental entities; and

the judge to whom this case is assigned and any immediate family members thereof.

114.    Certification of Plaintiff's claims for class-wide treatment is appropriate because

Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as

would be used to prove those elements in individual actions alleging the same claims.

115.    **Numerosity** – Federal Rule of Civil Procedure 23(a)(1).  The members of the

Classes are so numerous that individual joinder of all Class Members is impracticable.  On

information and belief, there are thousands, if not millions, of consumers who have been

damaged by Defendants' wrongful conduct as alleged herein.  The precise number of Class

Members and their addresses is presently unknown to Plaintiff but may be ascertained from

Defendants' books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, in-app notices, and/or published notice.

116. **Commonality and Predominance** – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3). This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

    a.    whether Defendants engaged in deceptive acts or practices in connection with the Tournament;

    b.    whether Defendants retained any benefit in connection with the Tournament;

    c.    whether Defendants would be unjustly enriched by retaining any benefit;

    d.    whether Plaintiff and the Classes are entitled to damages.

117. **Typicality** – Federal Rule of Civil Procedure 23(a)(3). Plaintiff's claims are typical of the other Class Members' claims because, among other things, all Class Members were comparably injured through the uniform prohibited conduct described above.

118. **Adequacy of Representation** – Federal Rule of Civil Procedure 23(a)(4). Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the other Class Members she seeks to represent; she has retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Class Members will be fairly and adequately protected by the Plaintiff and her counsel.

119. **Declaratory and Injunctive Relief** – Federal Rule of Civil Procedure 23(b)(2). Defendants have acted or refused to act on grounds generally applicable to Plaintiff and Class Members, thereby making appropriate final injunctive relief and declaratory relief with respect to the Classes as a whole. Specifically, Plaintiff seeks an order requiring Defendants to provide fair

and accurate disclosures to all contestants of future tournaments.

120. **Superiority** – Federal Rule of Civil Procedure 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I
### Violation of the Virginia Consumer Protection Act
### (On Behalf of the Virginia Class and Subclass)

121. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as though set forth fully herein.

122. Plaintiff and members of the Virginia Class and Subclass bring this count as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

123. The Virginia Consumer Protection Act ("VCPA") expressly prohibits "Using any . . . deception, fraud, false pretense, false promise or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200(14).

124. The Defendants are "seller[s], lessor[s], licensor[s], or professional[s] who

30

advertise[], solicit[], or engage[] in consumer transactions," or "manufacturer[s], distributor[s], or licensor[s] who advertise[] and sell[], lease[], or license[] goods or services to be resold, leased, or sublicensed by other persons in consumer transactions" and are therefore "suppliers" pursuant to Va. Code Ann. § 59.1-198.

125.    Plaintiff and the Virginia Class and Subclass Members purchased Defendants' products and services for personal, family or household use.  Accordingly, in offering the Candy Crush app, in advertising and conducting the Tournament, and in offering in-app purchases, Defendants engaged in "[t]he advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family or household purposes," and therefore engaged in "consumer transactions" pursuant to Va. Code Ann. § 59.1-198.

126.    In connection with the Tournament, Defendants knowingly, intentionally, and with intent to mislead, misrepresented to Plaintiff and Virginia Class and Subclass Members the number of competitors participating in and advancing to each stage of the Tournament, leading Plaintiff and Virginia Class and Subclass Members to believe they were outperforming the competition and had a reasonable chance of advancing in, and ultimately winning, the Tournament, when in fact, Plaintiff and Virginia Class and Subclass Members were competing against a significantly larger number of competitors.  On information and belief, Defendants made these misrepresentations intentionally to incentivize Plaintiff and Virginia Class and Subclass Members to continue playing in the Tournament, and spending money on in-app purchases during the Tournament, because had Plaintiff and Virginia Class and Subclass Members known their true standing, they would not have spent money on in-app purchases under the belief that they had a reasonable chance of winning a significant prize.

127.    Additionally, Defendants were aware that cheating was taking place during the

Tournament, yet failed to disclose it to Plaintiff and Virginia Class and Subclass Members and did nothing to stop it. Defendants were also aware that certain Super Users that had significant advantages were participating in the Tournament, but failed to disclose the existence of Super Users to Plaintiff and Virginia Class and Subclass Members, or that Super Users would be permitted to use their enhanced abilities during the Tournament. And Defendants permitted certain players to play "offline," obscuring their true performance in the Tournament, but failed to disclose to Plaintiff and Class Members the existence and prevalence of such players. On information and belief, Defendants knowingly, intentionally, and with intent to mislead concealed this information from Plaintiff and Virginia Class and Subclass Members, because if Class Members had been aware that cheaters, Super Users, and offline players were permitted to compete without consequence, Plaintiff and Virginia Class and Subclass Members would not have entered or continued playing in the Tournament and spent significant amounts of money on in-app purchases. Defendants concealed all of these facts despite having a duty to disclose such facts due to Defendants' knowledge that Plaintiff and Virginia Class and Subclass Members were acting upon the assumption that these facts did not exist and that the Tournament was fair.

128. Defendants' representations and omissions concerning the Tournament were material to a reasonable consumer and were designed to affect consumer decisions and conduct. Plaintiff and Virginia Class and Subclass Members reasonably relied on Defendants' material misrepresentations and omissions in deciding to participate in, and spending significant amounts of time and money in, the Tournament. Plaintiff and Virginia Class and Subclass Members would not have participated in the Tournament and made extensive in-app purchases absent Defendants' false and misleading representations and omissions.

129. Defendants' practices discussed above constitute deception, fraud, false pretense,

false promise or misrepresentation in connection with a consumer transaction in violation of the VCPA, and Defendants' conduct was willful.

130.     The foregoing fraudulent and deceptive practices directly, foreseeably and proximately caused Plaintiff and the Virginia Class and Subclass Members to suffer ascertainable losses when they devoted significant time and effort to the Tournament, made extensive in-app purchases during the Tournament, and provided Defendants substantial revenues, which they would not have absent Defendants' false and misleading representations and omissions.

131.     Plaintiff, on behalf of herself and each of the other members of the Virginia Class and Subclass, seeks to recover the damages suffered, including actual and treble damages, attorneys' fees, costs of suit, and other relief as appropriate.

**COUNT II**
**Fraud**
**(On Behalf of the Nationwide Class and Subclass)**

132.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as though set forth fully herein.

133.     Plaintiff and members of the Nationwide Class and Subclass bring this count as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

134.     As set forth above, in connection with the Tournament, Defendants knowingly, intentionally, and with intent to mislead, misrepresented to Plaintiff and Nationwide Class and Subclass Members the number of competitors participating in and advancing to each stage of the Tournament, leading Plaintiff and Nationwide Class and Subclass Members to believe they were outperforming the competition and had a reasonable chance of advancing in, and ultimately winning, the Tournament, when in fact, Plaintiff and Nationwide Class and Subclass Members

33

were competing against a significantly larger number of competitors.  On information and belief, Defendants made these misrepresentations intentionally to incentivize Plaintiff and Nationwide Class and Subclass Members to continue playing in the Tournament, and spending money on in-app purchases during the Tournament, because had Plaintiff and Nationwide Class and Subclass Members known their true standing, they would not have spent money on in-app purchases under the belief that they had a reasonable chance of winning a significant prize.

135.    Additionally, Defendants were aware that cheating was taking place during the Tournament, yet failed to disclose it to Plaintiff and Nationwide Class and Subclass Members and did nothing to stop it.  Defendants were also aware that certain Super Users that had significant advantages were participating in the Tournament, but failed to disclose the existence of Super Users to Plaintiff and Nationwide Class and Subclass Members, or that Super Users would be permitted to use their enhanced abilities during the Tournament.  And Defendants permitted certain players to play "offline," obscuring their true performance in the Tournament, but failed to disclose to Plaintiff and Nationwide Class and Subclass Members the existence and prevalence of such players.  On information and belief, Defendants knowingly, intentionally, and with intent to mislead concealed this information from Plaintiff and Nationwide Class Members, because if Class Members had been aware that cheaters, Super Users, and offline players were permitted to compete without consequence, Plaintiff and Nationwide Class and Subclass Members would not have entered or continued playing in the Tournament and spent significant amounts of money on in-app purchases.  Defendants concealed all of these facts despite having a duty to disclose such facts due to Defendants' knowledge that Plaintiff and Nationwide Class Members were acting upon the assumption that these facts did not exist and that the Tournament was fair.

136.     Defendants' representations and omissions concerning the Tournament were material to a reasonable consumer and were designed to affect consumer decisions and conduct. Plaintiff and Nationwide Class and Subclass Members reasonably relied on Defendants' material misrepresentations and omissions in deciding to participate in, and spending significant amounts of time and money in, the Tournament.  Plaintiff and Nationwide Class and Subclass Members would not have participated in the Tournament and made extensive in-app purchases absent Defendants' false and misleading representations and omissions.

137.     The foregoing fraudulent and deceptive practices were willful, and directly, foreseeably and proximately caused Plaintiff and the Nationwide Class and Subclass Members to suffer ascertainable losses when they devoted significant time and effort to the Tournament, made extensive in-app purchases during the Tournament, and provided Defendants substantial revenues, which they would not have absent Defendants' false and misleading representations and omissions.

138.     Plaintiff, on behalf of herself and each of the other members of the Nationwide Class and Subclass, seeks to recover the damages suffered, including actual and punitive damages, attorneys' fees, costs of suit, and other relief as appropriate.

### COUNT III
**Unjust Enrichment**
**(On Behalf of the Nationwide Class and Subclass)**

139.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as though set forth fully herein.

140.     Plaintiff and members of the Nationwide Class and Subclass bring this count as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

141.     Through the unfair, fraudulent, and deceptive acts described herein, Defendants

induced Plaintiff and Nationwide Class and Subclass Members to expend significant amounts of time, effort, and money in connection with the Tournament, including the making of extensive in-app purchases in connection with the Tournament.

142.    On information and belief, Defendants profited in millions—if not tens of millions—of dollars as a result of Plaintiff's and Class Members' participation in the Tournament and making of extensive in-app purchases during the Tournament.  Defendants were aware of the benefits conferred upon them by Plaintiff and Nationwide Class and Subclass Members and under the circumstances should have expected to repay Plaintiff and Nationwide Class and Subclass Members.

143.    Under the circumstances, it would be unjust and inequitable for Defendants to retain this benefit without paying for its value, and Plaintiff and the other Class Members should be compensated by an ascertainable value to be proven at trial based on the retention of the benefit.

144.    This unjust enrichment has been to the detriment of Plaintiff and other members of the Nationwide Class and Subclass.

145.    Plaintiff, on behalf of herself and each of the other members of the Nationwide Class and Subclass, seeks to recover monetary damages and other relief as appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, respectfully requests that this Court:

a.    Certify the proposed Classes and appoint Plaintiff and her legal counsel to represent the Classes;

b.    Find in favor of Plaintiff and the Classes on all counts asserted herein;

c.    Award damages, including compensatory, statutory, and punitive damages to

Plaintiff and the Classes in an amount to be determined at trial;

d.     Grant restitution to Plaintiff and the Classes and require Defendants to disgorge their ill-gotten benefits;

e.     Award Plaintiff and the Classes reasonable attorneys' fees and the costs and disbursements of this suit incurred herein;

f.     Award Plaintiff and the Classes pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law;

g.     Award Plaintiff and the Classes injunctive relief pursuant to Rule 23(b)(2); and

h.     Order any such other and further relief the Court deems just and equitable.

### **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all counts herein and of all issues so triable.

Respectfully Submitted,

*/s/ Genevieve C. Bradley*
Genevieve C. Bradley
VSB No. 83325
ROTH JACKSON GIBBONS CONDLIN, PLC
8200 Greensboro Drive, Suite 820
McLean, Virginia 22102
(703) 485-3531
(703) 485-3525 (fax)
gbradley@rothjackson.com

Sean M. Gibbons
VSB No. 40981
ROTH JACKSON GIBBONS CONDLIN, PLC
1519 Summit Ave., Suite 102
Richmond, VA 23230
(804) 441-8442
(804) 441-8438 (fax)
sgibbons@rothjackson.com

Martin W. Jaszczuk (*Pro Hac Vice* to be filed)
Daniel I. Schlessinger (*Pro Hac Vice* to be filed)
Margaret Schuchardt (*Pro Hac Vice* to be filed)
Seth Corthell (*Pro Hac Vice* to be filed)
**JASZCZUK P.C.**
311 South Wacker Drive
Suite 2150
Chicago, Illinois 60606
Tel: (312) 442-0509
mjaszczuk@jaszczuk.com
dschlessinger@jaszczuk.com
mschuchardt@jaszczuk.com
scorthell@jaszczuk.com

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Sorina Montoya | King.com Limited, King Digital Entertainment PLC, Activision Blizzard Inc. |

**(b)** County of Residence of First Listed Plaintiff   Chesterfield, VA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
ROTH JACKSON GIBBONS CONDLIN, PLC, 8200 Greensboro Drive, Suite 820, McLean, VA 22102

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [x] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [x] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332(d)

Brief description of cause:
Violation of the Virginia Consumer Protection Act, Fraud, Unjust Enrichment

## VII. REQUESTED IN COMPLAINT:

[x] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE
5/9/2023

SIGNATURE OF ATTORNEY OF RECORD
/s/ Genevieve C. Bradley

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# -EXHIBIT C-

This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Circuit Courts.
Forms are free at ilcourts.info/forms.

FILED DATE: 1/17/2025 3:33 PM    20251101791

| STATE OF ILLINOIS, CIRCUIT COURT | SMALL CLAIMS COMPLAINT | For Court Use Only |
|---|---|---|
| Cook  COUNTY | | FILED 1/17/2025 3:33 PM Mariyana T. Spyropoulos CIRCUIT CLERK COOK COUNTY, IL 20251101791 Courtroom, 1501 31030965 |

**Instructions ▼**

Directly above, enter the name of the county where you are filing the case.

Enter your name as Plaintiff.

Enter the names of all people or businesses you are suing as Defendants.

The Circuit Clerk will add a Case Number.

Carol Smith
**Plaintiff** *(First, middle, last name)*

v.
System Generated Hearing Date: <<CmsHearingStart>>
Location: <<CmsHearingResource="Location">>
Judge: <<CmsHearingResource="JudicialOfficer">>

**Defendants** *(First, middle, last name or business name):*
King.com Limited

King Digital Entertainment PLC

Activision Blizzard, Inc.

**20251101791**

**Case Number**

For updated information about your case, including hearings, subsequent filings and other case information, please visit our Online Case Search and search for your case: https://casesearch.cookcountyclerkofcourt.org

**Jury Trial Request by Filing Separate Form.** If you want your case decided by a jury instead of a judge, you have to file a *Jury Request* form. Jury trials can sometimes be more complicated and an additional fee may be required.

---

In **1**, enter your name.

1. I,  Carol Smith , am the Plaintiff.
   *First, Middle, Last*

In **2**, enter the name and address of each Defendant.

If you are suing more than 2 Defendants, use the *Additional Defendants (Small Claims Complaint)* form and attach it.

2. Defendant's name and address is:  King.com Limited
   *First, Middle, Last*

   Aragon Business Centre, Level 4, Dragonara Road, St Julian's, Malta STJ3140
   *Street, Unit #          City          State          ZIP*

   Defendant #2's name and address is:  King Digital Entertainment PLC
   *First, Middle, Last*

   6th Floor, 2 Grand Canal Square, Dublin 2, D02A342, Ireland
   *Street, Unit #          City          State          ZIP*

   [✔] I have listed additional Defendants on the attached *Additional Defendants (Small Claims Complaint)* form.

In **3**, enter the amount of money that is owed to you. It must be $10,000 or less. Do not include court costs. Check **3a**, **3b**, or **3c**. If you have a written agreement, attach that contract or other document as proof of your agreement to this *Small Claims Complaint,* or explain why you cannot.

3. Defendants owe me  $ 5,000.00  and *(check one):*
   [ ] a.  I have no written agreement with Defendants.
   [ ] b.  I have a written agreement with Defendants and it is attached.
   [✔] c.  I have a written agreement with Defendants but I have not attached it because:
   the bases of my causes of action are in statute and Illinois common law.

   _____ .

In **4**, check the box if it applies.

4. [ ]  I have demanded payment of the amount listed in Section 3 and Defendants have failed to pay in full.

Enter the Case Number given by the Circuit Clerk: _____

| | |
|---|---|
| In **5**, enter the reasons why Defendant owes this money to you. | **5.**   Defendants owe me this amount of money because: _____<br>The details of my dispute with Defendants are outlined in the Demand which is attached as<br>Exhibit A. |

FILED DATE: 1/17/2025 3:33 PM   20251101791

If you need more space, complete the *Additional Reasons (Small Claims Complaint)* form and check the box.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

☐   I have attached an *Additional Reasons (Small Claims Complaint)* form.

| | |
|---|---|
| Under Illinois Supreme Court Rule [137], your signature means that you have read the document, that to the best of your belief, it is true and correct and that you are not filing it for an improper purpose, such as to cause delay. | |

/s/ Akshay Soman                              Akshay Soman
*Your Signature*                                *Print Your Name*

311 S. Wacker Dr., Suite 2150        Chicago, IL  60606
*Street Address*                               *City, State, ZIP*

If you are completing this form on a computer, sign your name by typing it. If you are completing it by hand, sign and print your name.

(312) 442-0509                             asoman@jaszczuk.com
*Telephone*                                    *Email Address*

Enter your complete address, telephone number and email address, if you have one.

Firm No. 61115
*Attorney # (if any)*

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

**This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Circuit Courts.**

| STATE OF ILLINOIS, CIRCUIT COURT | ADDITIONAL DEFENDANTS (SMALL CLAIMS COMPLAINT) | For Court Use Only |
|---|---|---|

Cook _____ COUNTY

*FILED DATE: 1/17/2025 3:33 PM    20251101791*

FILED
1/17/2025 3:33 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
20251101791
Courtroom, 1501
31030965

**Instructions ▼**

Directly above, enter the name of the county where you are filing the case.

Enter your name as Plaintiff.

Enter the names of all people or businesses you are suing as Defendants.

The Circuit Clerk will add a Case Number.

Carol Smith
_____
**Plaintiff** *(First, middle, last name)*

v.

System Generated Hearing Date: <<CmsHearingStart>>
Location: <<CmsHearingResource="Location">>
Judge: <<CmsHearingResource="JudicialOfficer">>

**Defendants** *(First, middle, last name or business name)*:

King.com Limited
_____

King Digital Entertainment PLC
_____

Activision Blizzard, Inc.
_____

**20251101791**
_____
**Case Number**

Fill out this form only if you have more than 2 Defendants. If you fill it out, attach this form to your *Small Claims Complaint.*

Defendant #3's name and address is: Activision Blizzard, Inc.
_____
*Name*
2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833
_____
*Street, Unit #                          City                          State          ZIP*

Defendant #4's name and address is: _____
*Name*

_____
*Street, Unit #                          City                          State          ZIP*

Defendant #5's name and address is: _____
*Name*

_____
*Street, Unit #                          City                          State          ZIP*

Defendant #6's name and address is: _____
*Name*

_____
*Street, Unit #                          City                          State          ZIP*

Defendant #7's name and address is: _____
*Name*

_____
*Street, Unit #                          City                          State          ZIP*

Defendant #8's name and address is: _____
*Name*

_____
*Street, Unit #                          City                          State          ZIP*

Defendant #9's name and address is: _____
*Name*

_____
*Street, Unit #                          City                          State          ZIP*

CS-AD 703.1                                Page 1 of 1                                (08/20)

FILED
1/17/2025 3:33 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
20251101791
Courtroom, 1501
31030965

20251101791

FILED DATE: 1/17/2025 3:33 PM   20251101791

# -EXHIBIT A-

FILED DATE: 1/17/2025 3:33 PM    20251101791

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, MUNICIPAL DIVISION**

| | |
|---|---|
| Carol Smith, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| King.com Limited, King Digital Entertainment | ) |
| Limited, and Activision Blizzard Inc., | ) |
| | ) |
| Defendants. | ) |

Case No. **20251101791**

**DEMAND**

Plaintiff Carol Smith ("Plaintiff" or "Carol"), by and through her attorneys, Jaszczuk P.C., and for her complaint against Defendants King.com Limited ("King"), King Digital Entertainment Limited ("King Digital") and Activision Blizzard, Inc. ("Activision," and together with King and King Digital, "Defendants"), states as follows:

**INTRODUCTION**

1.      On March 23, 2023, Defendants launched Candy Crush All Stars 2023, a mobile gaming contest based on the popular Candy Crush application.  Promising $250,000 in prizes and an expense-paid trip to London for 10 finalists, Defendants sought to entice gamers to enter the competition and put their skills to the test against other players around the world.  All in good fun.  Or was it?

2.      As it turns out, behind the bright colors, adorable icons and happy music—all of which serve to entertain users and to keep them coming back—there is another aspect to the game.  An aspect that does not serve users but, instead, serves Defendants: the option for users to purchase a variety of intangible items, such as extra lives and boosters, that benefit players in the

1

FILED DATE: 1/17/2025 3:33 PM    20251101791

game.

3.      In short, Defendants give players the option to use the money they earned in the real world, which could be used to purchase milk, bus rides, or staplers, to instead purchase extra lives, color bombs, lollipop hammers, and extra moves – all of which help players be more successful playing Candy Crush.

4.      And that is, largely, how Defendants earn money.  Quite a bit of it, in fact.  In 2014, Candy Crush users reportedly spent over $1.3 billion on in-app purchases.[1]

5.      But Defendants have a problem.  The vast majority of players decline the invitation to trade real dollars for intangible inventions.[2]  And so, Defendants must come up with new ways to entice more users to spend money and to spend more of it.

6.      Enter Candy Crush All Stars 2023 (the "Tournament").

7.      With $250,000 in prizes and an expense-paid trip to London on the line, Candy Crush players were presented with plenty of incentive to show up, enter the Tournament and spend their money on a variety of boosters and extra lives to help them beat their fellow competitors to one of the ten available golden tickets to London.

8.      And show up they did.  In droves.  Some users have estimated that over one million players advanced to the "Semi Finals."[3]  And all these players, faced with the allure of a six-figure grand prize and a trip to England, were well incentivized to spend their funds on in-app purchases.

9.      There is, perhaps, a debate to be had about the interplay between such incentives,

---

[1] https://www.theguardian.com/technology/2015/feb/13/candy-crush-saga-players-855m-2014.
[2] *Id.*
[3] Excerpt from Candy Crush Reddit Forum,
https://www.reddit.com/r/candycrush/comments/12wto6j/over_1000000_in_the_semi_finals_of_all_stars/

2

companies' profit-making motives, and personal choice. But such philosophical and political discussions are beyond the scope of this Demand.

10.     Instead, this Demand is focused on one key proposition: consumers are entitled to be presented with the information they will need to make an informed decision about whether to spend their funds on in-app purchases. And this is where Defendants' conduct fell short. Woefully short.

11.     Specifically, Defendants failed to inform Plaintiff, and in some instances actively misrepresented, four key pieces of information: (1) the number of players advancing through each Tournament stage, (2) that some competitors gain an unfair advantage by cheating, (3) that some competitors have an unfair advantage because they have unlocked game modes that give them enhanced abilities ("Super Users"), and (4) that some users can play offline, which masks their running scores.

12.     _Number of Players_ – While Defendants have not released exact numbers, it appears that well over one million players took part in the Tournament. And Defendants stood to profit handsomely if they could convince a significant portion of these players to make in-app purchases in an effort to finish in the top ten on the Tournament leaderboard. But Defendants knew that a player who recognizes that she is currently number 27,412 on the leaderboard will be unlikely to spend significant funds on in-app purchases. So, at each stage of the Tournament, Defendants placed contestants into artificially small groups of no more than 50 players, and used terms such as "Quarter Finals" and "Semi Finals," to manipulate users into thinking that they were doing well against their peers and were getting close to the 10 coveted London spots. On information and belief, this tactic worked wonderfully—from a fiscal perspective—for Defendants. Players in small groups spent dearly to outcompete others, thinking that they had a

3

FILED DATE: 1/17/2025 3:33 PM    20251101791

legitimate chance of advancing further, if they could only win their particular pool. This was unadulterated deception.

13.    _Cheaters_ – Within days of the Tournament's start, Candy Crush-related bulletin boards lit up with Tournament contestants complaining about rampant cheating. There are a plethora of examples. Suffice it to say, Defendants were well aware that cheating was highly probable, but failed to put proper measures in place to prevent cheating and failed to adequately deal with cheaters once the Tournament began. This put honest players at a significant disadvantage and caused honest players to spend more money on in-app purchases trying to beat the cheaters. It also caused honest players to enter the Tournament to begin with, which many would not have done had they known that they would be competing with cheaters.

14.    _Super Users_ – Some players have played Candy Crush for so long and have gotten so far in the game that they have earned in-app abilities that are not available to mere mortals – they become "Super Users." When Super Users play Candy Crush, their powers (_e.g._, ability to play previous boards that have score multipliers) make it significantly easier for them to score points. Player commentary available online indicates that a number of Super Users took part in the Tournament and, unsurprisingly, easily beat their competitors. Defendants failed to disclose to Plaintiff both the existence of Super Users and that Super Users would be permitted to take part in the Tournament with their super powers unchecked. This had the intended effect of misleading Plaintiff into thinking they had a fair chance of competing and caused them to spend money on in-app purchases they otherwise would not have spent.

15.    _Offline Players_ – While playing the Tournament, players are shown a live leaderboard that informs them of their current standing. Players use their standing to make a reasoned determination about the benefit of in-app purchases. For instance, a player ranked #35

4

in a pool of 50 players may decide that paying for boosters is not a sound financial proposition, while a player ranked #3 might determine that paying a few hundred dollars to get to first place is a good bargain. But a player can only make a reasoned choice if she has an accurate gauge of where she stands. And, as it turns out, Defendants misled Plaintiff on this account as well. Specifically, Defendants permitted players to play "offline" at times. During these periods, the offline players were earning significant points, whereas their scores on the official leaderboard appeared unchanged. Then, with minutes left in the game, the offline players came back online and leapfrogged over Plaintiff who, all along, were making their purchasing decisions based on their perceived standing on the leaderboard. By failing to disclose the existence and prevalence of offline players, Defendants caused Plaintiff to make in-app purchases they otherwise would not have made had they known their true standing on the leaderboard.

16.    In all, Defendants' actions in misrepresenting and concealing the number of players in the competition, and the existence of cheaters, Super Users and offline players, had the effect of causing Plaintiff to overestimate their chances of success, which in turn had the intended effect of causing Plaintiff to spend significant sums on in-app purchases that they otherwise would not have spent.

17.    Accordingly, Plaintiff brings this action to remedy Defendants' deceptive conduct in connection with Defendants' operation of the Tournament. Defendants induced Plaintiff to participate in the Tournament—and spend countless hours of time on the game and untold amounts of money on in-app purchases—with the promise of a fair chance at winning a share of a $250,000 grand prize. In reality, however, the Tournament was administered by Defendants in a deceptive manner that tricked players into believing they were performing better in comparison to other players than they actually were, and the competition was riddled with cheating and other

5

FILED DATE: 1/17/2025 3:33 PM    20251101791

conduct that severely decreased Plaintiff's chances of winning, which Defendants knew but failed to remedy. Plaintiff brings this action for violations of Illinois' consumer protection statute, as well as unjust enrichment and fraud.

## FACTUAL BACKGROUND

18.    In the past ten years, mobile gaming has become ubiquitous in American society. Whereas twenty years ago consumers were limited to rudimentary games like Tetris and Snake, the advent of smart phones and—perhaps more importantly—technology that allows consumers to seamlessly make in-app purchases, has led to an explosion in the market for mobile gaming.

19.    There is also, however, a dark side to the mobile gaming craze – the games can be extremely addictive and financially ruinous.[4]  And in many cases the addictiveness of the games is by design, as mobile gaming companies make more money if consumers spend more time gaming and, critically, making in-app purchases.

20.    One of the pioneers of this business model is Defendant King, which developed the wildly popular game, Candy Crush Saga ("Candy Crush").[5]

21.    King launched Candy Crush as a mobile game available on iOS in 2012. Almost immediately after its release, Candy Crush became one of the most popular and profitable mobile games on the market.[6]

22.    From 2012 to 2013, the first year Candy Crush was available for iOS, King's revenue increased 1084%.[7]

---

[4] Addictions Content Team, *A New Addiction on the Rise: Mobile Game Addiction*, ADDICTIONS (July 7, 2021), https://www.addictions.com/blog/a-new-addiction-on-the-rise-mobile-game-addiction/.
[5] *Id. See also* Eliana Dockterman, *Candy Crush Saga: The Science Behind Our Addiction*, TIME (Nov. 15, 2013), http://business.time.com/2013/11/15/candy-crush-saga-the-science-behind-our-addiction.
[6] David Curry, *Candy Crush Revenue and Usage Statistics (2023)*, BUSINESS*OF*APPS (Jan 9, 2023), https://www.businessofapps.com/data/candy-crush-statistics/.
[7] *Id.*

FILED DATE: 1/17/2025 3:33 PM    20251101791

23.    In large part as a result of Candy Crush's success, King was able to go public in 2013, and was subsequently acquired by Defendant Activision Blizzard for $5.9 billion in 2016.

24.    In the period 2013 through 2017, Candy Crush was consistently the first or second most popular mobile game on the market.[8]

25.    The game's popularity has hardly waned.  In 2022, 138 million users downloaded Candy Crush from the iOS app store and Google Play.[9]  And in 2021, Candy Crush generated over $1 billion in revenue.[10]

**A.  THE CANDY CRUSH GAME**

26.    Candy Crush is a match-making puzzle game.  Users—who can play the game on both iPhones and Android devices—attempt to "crush" candies by matching three or more of the same candy icons in consecutive order, thus clearing them from the game board and earning points.

27.    Each game starts with a fresh game board, for which users are assigned a specific goal, such as accumulating a given number of points.  But users are given a limited number of moves or turns to reach the given goal.

28.    If a user fails to accomplish the goal within the given number of turns, she loses a life ("Life" or "Lives") and must start the board over again.

29.    Players are only afforded five Lives at the outset of the game.  Once users lose those five Lives, they must wait thirty minutes for a new Life to regenerate before they can play again.

---

[8] *Id.*
[9] Jordan Bevan, *Candy Crush Saga Revenue and Usage Statistics*, MOBILE MARKETING READS (Jan. 11, 2023), https://mobilemarketingreads.com/candy-crush-saga-revenue-and-usage-statistics-2020/.
[10] *Id.*

FILED DATE: 1/17/2025 3:33 PM    20251101791

30.  But waiting is not the only option.  Users who want to continue playing without waiting 30 minutes are given the option of purchasing more Lives, which then permits them to continue playing immediately.

31.  And thus enters the true point of the game—at least from Defendants' perspective—the in-app purchases by which Defendants earn revenue.

32.  Since the game's inception, Defendants have created a variety of in-app purchases to entice gamers to spend money.  In addition to buying Lives, users can purchase a variety of boosters, such as lollipop hammers, extra moves, free switches, and UFOs, all of which enable players to increase their scores or otherwise "crush" candies more effectively.

## B.  THE CANDY CRUSH ALL STARS 2023 TOURNAMENT

33.  In 2021, Defendants generated over $1 billion in revenue from Candy Crush, a significant portion of which derived from in-app purchases.[11]

34.  While this number seems astounding for a simple mobile game, more surprising is that this revenue was generated from a very small proportion of players, as the vast majority of users do not spend money on the app and play for free.[12]

35.  As such, even though Candy Crush is already a smashing financial success, from a corporate perspective there is a significant untapped supply of free riders who can potentially be induced to become paying users.

36.  But how best to do so?

37.  Enter Candy Crush All Stars 2023.

38.  Defendants billed the Tournament as the "sweetest and biggest tournament of the

---

[11] *Id.*
[12] Stuart Dredge, *Candy Crush Saga players spent £865m on the game in 2014 alone*, THE GUARDIAN (Feb. 15, 2015, 6:45 AM EST) https://www.theguardian.com/technology/2015/feb/13/candy-crush-saga-players-855m-2014.

FILED DATE: 1/17/2025 3:33 PM    20251101791

year."[13]

39.     Prizes included a share of $250,000, a trip to London for the Tournament final for ten finalists, and customized Candy Crush-inspired championship rings with a combined value of over $72,900.[14]

40.     Tournament competitors were tasked with collecting special purple star shaped candies and ostensibly could track their score and rank relative to other players on a leaderboard.

41.     The Tournament was divided into nine separate stages, beginning with qualifier rounds and eventually progressing to Quarter Finals and three stages billed as Semi Final 1, Semi Final 2, and Semi Final 3, followed by the Final in London, England.

42.     At each stage, users' scores were displayed on Tournament leaderboards with up to 50 contestants, and competitors were required to place at or above a certain rank in their given leaderboard to qualify for the next round.

43.     In total, 10 players would qualify for the Final.  But, other than the Final, Defendants did not specify how many individuals would qualify for each successive Stage.

44.     The Tournament commenced on March 23, 2023.

45.     As promoters and financial beneficiaries of the Tournament, Defendants had an obligation to users to ensure that the Tournament was structured and overseen in a manner that ensured a baseline level of integrity, transparency, and fairness.

46.     But soon after the Tournament commenced, it became clear that the contest

---

[13] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/349656/%EF%BB%BFall-stars-the-sweetest-and-biggest-candy-crush-saga-tournament-of-the-year/p1.
[14] Lewis Rees, *Candy Crush Saga breaks records with All Stars Tournament*, POCKET GAMER (Mar. 20, 2023), https://www.pocketgamer.biz/news/81104/candy-crush-saga-breaks-records-with-all-stars-tournament/.

FILED DATE: 1/17/2025 3:33 PM    20251101791

Defendants had billed as "an exciting competitive tournament"[15] was in reality more akin to a scam.

47.    Specifically, Defendants structured the Tournament in a deceptive manner to create a false impression that players' odds of qualifying for the Final were higher than they actually were.  The reason was monetary – obscuring users' true odds of winning kept them invested in the Tournament, and more importantly, kept them spending money on in-app purchases.

48.    Defendants did so in at least four ways:

49.    *First*, Defendants deceived Plaintiff as to the number of competitors and, concomitantly, the true chances of making the Final round.

50.    Defendants segmented the Tournament into nine stages, from which a certain number of users would qualify for each successive stage.  To qualify, players had to attain a specified rank within a Tournament leaderboard group that included up to 50 players.

51.    But other than indicating that there would be 10 finalists, Defendants never informed Plaintiff how many other players were taking part in the competition.  To the contrary, Defendants did what they could to mislead contestants into thinking that they were doing well vis-à-vis their competitors, that there were few other players against whom they were competing, and that they had a good chance of making the Finals in London.  That kept Plaintiff spending money on in-app purchases.

52.    For instance, Defendants never provided an aggregate leaderboard or any other information that accurately represented how many competitors were still in the Tournament. Instead, Defendants placed gamers into small Tournament leaderboard groups of 50, which

---

[15] *Supra*, excerpt from King Community Forum, at n.17.

FILED DATE: 1/17/2025 3:33 PM    20251101791

ensured that contestants were only able to gauge their performance against a statistically insignificant number of competitors.  More importantly, it kept Plaintiff incentivized to spend money on in-app purchases.  After all, a contestant who thinks that she is #6 in her group of 50 is far more likely to spend money on in-app purchases than a contestant who can see that she is in position #126,456 out of 1 million.

53.    Defendants paired this deceptive small-group structure with misleading stage names to make contestants believe that they were approaching the Finals.  To that end, Defendants used terms such as "Semi Finals" and "Quarter Finals," terms that are commonly understood to mean that competitors are one and two stages, respectively, from the Finals (and are typically also indicative of a stage in the contest where there are only four and eight competitors remaining).

54.    That was far from reality.  Some players have estimated that over one million players advanced to the "Semi Finals."[16]

---

[16] *Supra*, Excerpt from Candy Crush Reddit Forum, n.3.

20251101791

# Over 1.000.000 in the "Semi Finals" of All Stars

I think we all know by now that Candy Crush All Stars is/was a scam. Giving you hope and the feeling that you are so close to the final with a trip to London, that the "investment" is worth it.
It's not, and it never was.

Doing the math, in the three rounds of the semi finals, only 1:50 progressed each. So for each of the 10 finalists, there are 50 in the last round of the semifinals, 50 times 50 in the second round and 50 times 50 times 50 in the first round of the semi finals.

In other words: 1.250.000 players progressed into the "Semi Finals". This wording gave each a feeling of chance, that there is a possibility to win a trip to London. But if you know, that there is a million others against you and getting points is more about spending money than skill, would you continue to participate?

55.    Defendants' decision to place contestants into small leaderboard groups and to use misleading stage names created a false impression that was designed by Defendants to increase in-app spending.

56.    One competitor summed it up fairly succinctly:[17]



**christinewupp** Posts: 791   Level 3

April 19

I have been really saddened by reading so many players have spent so much of their money on All Stars.

Those of us with years of experience and some mathematical knowhow have tried from the outset to warn others that there are millions competing in the semi finals and that only the madly obsessed non stop players or cheaters stand a chance of winning. Why have so many people been duped into believing they could win? It's not your fault: King have deliberately kept the number of competitors secret, introduced so many wild card rounds and chances to make it really easy for anyone to qualify for the semi finals. The term "semi final" was misleading to a huge degree, making people think they were anywhere near the final, like it is in the world cup. The whole tournament is designed to mislead players into spending money for what was essentially a lottery.

Ah yes, and everyone who filled out the contact form will get lots of spam soon because the data is sold to third parties.

⚑ Flag    ❝ Reply    ⚲ 4 Helpful    ♨ 1 Sweet    ♥ 2 Love    ☺ 1 Haha

---

[17] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/401713/all-stars-was-it-really-worth-it/p1.

FILED DATE: 1/17/2025 3:33 PM    20251101791

FILED DATE: 1/17/2025 3:33 PM    20251101791

57.    Another competitor revealed that, after everything was said and done, he had spent more money on in-app purchases during the Tournament than it would have cost him to simply purchase a plane ticket and accommodations in London:[18]



**zedzee** Posts: 13    Level 2
April 19

All I can say is " we are in the same boat ". I put 3 credit cards in my Auto Payment. After 4 days straight of playing CCSaga All Stars, I am now owing my credit cards, more than the total amount of the R/T tickets to London + hotel accommodation. It felt like I was possessed when I was playing it that I did not mind about the bills I would incur after the tournament.

⚐ Flag    ❝ Reply    ♡ Helpful    👍 1 Sweet    ❤ 1 Love    😆 1 Haha

58.    The dismay expressed by the foregoing user, and the financial harm he has suffered, were both directly caused by Defendants' deceptive conduct.  There is more.

59.    *Second*, Defendants failed to disclose the existence of, and failed to properly deal with, cheaters.

60.    When Plaintiff agreed to participate in the Tournament and to spend time and money competing, they did so with the expectation that the competition would be fair.

61.    It was anything but.

62.    As the Tournament progressed, user complaints documenting suspicious activity and Defendants' indifference to those concerns quickly began surfacing on Defendants' own forum.[19]

---

[18] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/comment/2614682#Comment_2614682.
[19] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/comment/2616175#Comment_2616175; https://community.king.com/en/candy-crush-saga/discussion/comment/2617209#Comment_2617209.

FILED DATE: 1/17/2025 3:33 PM    20251101791



**MelleLilou** Posts: 19   Level 2

April 20

Totally agree with you. I started the competition as soon as the second semi-final was launched. When my scoreboard opened after my first game, the first players were already over 30,000 points! I took screenshots to monitor the scores and the time elapsed. In 5 minutes, I won 15/20,000 points maximum, they won 200,000! How is it possible ?!

Either they are bots and therefore impossible to beat, or they are real players who cheat or are favored by King. I won all my games, my races of champions, I never managed to integrate the top 10 of my table so much the scores increased quickly. I gave up after 6 hours when they reached 1 million points (how is that possible?!) when I was barely at 400,000.

This morning when opening the game (I'm in France, it's barely 9:30 am here) the first players reached 3 million points. I have played enough to know that it is impossible to reach such a score even without taking a break. There is therefore cheating and/or rigging of scores.

🏳 Flag   🔖 Reply   💡 2 Helpful   👍 Sweet   ❤ 5 Love   😄 Haha



**JDTEX000** Posts: 9   Level 2

April 20

So I found out they can play this game on a phone and change the time ahead on their phone and it'll allow them to start earlier and if they are offline the system won't catch it . I watched the countdown and literally a second after it started some guy was at 500k so I put some money into it and lots and lots of time and he stayed a good 500k ahead every second all the way to the last second

🏳 Flag   🔖 Reply   💡 Helpful   👍 Sweet   ❤ Love   😄 1 Haha

63.     Properly investigating reports of cheating or implementing systems to prevent it at the scale needed for the Tournament would have decreased the profitability of the Tournament. So instead, Defendants either failed to investigate reports of cheating or, in some cases, did a cursory review and followed up with vague non-committal statements.

64.     And that put honest players at a significant disadvantage and caused Plaintiff to spend money on in-app purchases they otherwise would not have spent.

65.     *Third*, Defendants failed to disclose the existence of Super Users.

14

FILED DATE: 1/17/2025 3:33 PM    20251101791

66.     When Plaintiff entered the Tournament, they believed they had a fair chance of competing against other players.  Not so.  As it turns out, without providing any disclosure, Defendants permitted entry into the Tournament to individuals who had previously completed all of the 14,018 Candy Crush boards – let's call them "Super Users."

67.     Players who complete all available 14,018 Candy Crush boards are given access to a Star Tournament ("ST") (not to be confused with the Candy Crush Saga All Stars 2023 Tournament).

68.     Once Super Users have reached the ST level, they are provided with access to game boards that are not available to ordinary users.  Some of these game boards provide point multipliers of up to 30x or more, which provide Super Users with the ability to score points at an extraordinary pace that ordinary users cannot match.

69.     One such Super User who took part in the Tournament posted an explanation on a Candy Crush-related message board:[20]

> I've been playing for 59 minutes now and have scored 10,008, 980. I have to stop, a client requires my attention.
>
> Later.
>
> O course, 10 million points does not equate to 10 million purple stars that were in the All Stars Tournament, but it is an indicator, bearing in mind the x30 multiplier would have been applied, of the potential stars I might have won in these 59 minutes of play.
>
> I could have played on for another hour or more on that one level/game. In the semi finals I used the points gained as my guide and the greatest number I attained was 25 million before choosing to end that game. To other players it may have looked that I was a bot, suddenly appearing on the leader board with a very high number of purple stars, when, in fact, I was online, playing one good board in the Star Tournament.

---

[20] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/402853/ten-million-points-in-59-minutes-explained/p1

FILED DATE: 1/17/2025 3:33 PM    20251101791

I ended games so that other players could get a sense of my score and because I felt out of touch with the leader board. I was neck and neck with the player in second place for most of the night and they also *appeared* to me to be offline at times. They *may* have been doing exactly what I was doing. This was the only real element of fun – the rest of the experience was gruelling but it demanded commitment.

This is my explanation.

My score is totally dependent on my use of boosters that I have built up over 10 years. There is a cascade effect by using the combination of a colour bomb and hammer/pink lollipop. Creating lots of colour bombs and then exploding one which sets off a chain reaction. At one stage in the 3rd semi final the game played itself for 10 minutes and generated *loads* of very welcome points.

⚑ Flag  ❝ Reply  ♡ 2 Helpful  👍 Sweet  ❤ Love  😀 1 Haha

70.     Perhaps most interestingly, this Super User, while noting that his technique was legitimate as it was created by King, admitted that playing the Tournament as he did—with the 30x point multiplier that is available to Super Users but not to ordinary contestants—was "not really within the *spirit* of the game." When another competitor said it was unfair, he responded: "It isn't fair. I agree with you."[21]



---

FILED DATE: 1/17/2025 3:33 PM    20251101791



71.    To be clear, this Demand does not place blame on this particular Super User, or any other Super Users for that matter.  Super Users are not at fault for reaching the end of the game and being rewarded, by Defendant King, with super powers.  The fault here lies entirely with Defendants, who failed to either (a) limit the abilities of Super Users during the Tournament to ensure a level playing field, or (b) disclose to Plaintiff that they would be competing against Super Users, who had available to them in-game abilities that, for all intents and purposes, would make them virtually unbeatable by ordinary users.

72.    Indeed, unbeknownst to Plaintiff, ordinary users were in a situation not unlike pitting a junior high school football team against NFL players.

73.    Had she known about the existence of Super Users, Plaintiff would not have made the in-app purchases she made throughout the Tournament.

74.    One competitor—without Super User abilities—aptly summarized the point as

17

FILED DATE: 1/17/2025 3:33 PM    20251101791

follows:[22]



**Matjes** Posts: 29    Level 2
April 28

**@John_Porter**

For me, you are not a fraudster. You simply use your collected boosters. Unfortunately, you have an advantage (like other players): You play star event and can choose a good point level within a certain framework. I can't do that. With the same number of boosters used, you have of course collected much more purple stars. For us normal players, there is no chance to win. That's not a reproach against you because you can't do anything about it. If I repeat the semi-finals, I will therefore not waste any more money and only play normally and have fun. That's what the game is for. Good luck in the final if you're there 😊👍

⚑ Flag    ❝ Reply    ♡ Helpful    👍 2 Sweet    ♥ Love    😄 1 Haha





**chopstickcharmA** Posts: 56    Level 2
April 28

> **Matjes**   Apr 28, 2023
> **@John_Porter**
> For me, you are not a fraudster. You simply use your collected boosters.
> Unfortunately, you have an advantage (like other players): You play star event and
> ⌄

This is a perfect response. If you aren't in the Star tournament, you really never had a chance. King really created a cash grab scam.

⚑ Flag    ❝ Reply    ♡ Helpful    👍 1 Sweet    ♥ 1 Love    😄 Haha

75.    *Fourth*, Defendants failed to disclose the existence of Offline Players.

76.    Grouping players into artificially small groups, with no more than 50 on any

---

[22] Excerpt from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/402853/ten-million-points-in-59-minutes-explained/p2.

18

FILED DATE: 1/17/2025 3:33 PM    20251101791

given leaderboard was, as discussed above, patently misleading.  But that was not the only problem with the leaderboards.  A second issue is that they were inaccurate.

77.    Specifically, Defendants permitted players in the Tournament to play offline, meaning that certain players would be playing the game and accumulating points, but their true point totals would not be visible to Plaintiff in the same group until they came back online.

78.    The problem with this maneuver is that Plaintiff made their in-app purchasing decisions based on how they were doing vis-à-vis their competitors.  For instance, a player in third place may decide to spend money on boosters in an attempt to finish first, while a player in 12th place may decide to forego the same purchase.  The problem with offline players is that their true score is inaccurate while they are offline, thereby giving Plaintiff a misleading view of their standing on the leaderboard and an incentive to make in-app purchases that they otherwise may not be inclined to make.

79.    A number of Tournament competitors complained about this issue, pointing out how some offline players logged back in with minutes to spare and leapfrogged the competition:[23]



Riala  Posts: 6   Level 2
April 25

It is sad that there were so many offline dubious players maki g points that would be impossible to make. Too bad they didn't get grouped together themselves since they wait until last minute to see who guessed which impossible was going to win lol. It is sad that it looks like from how rampant this is is, no honest players are making it. I have not touched the game since I found out & learned my lesson.

⚑ Flag   ❝ Reply   👍 Helpful   ☺ Sweet   ♥ Love   ☺ Haha

---

[23] Excerpts from King Community Forum, https://community.king.com/en/candy-crush-saga/discussion/comment/2622023#Comment_2622023; https://community.king.com/en/candy-crush-saga/discussion/comment/2620238#Comment_2620238.

FILED DATE: 1/17/2025 3:33 PM    20251101791

But this N1 position wasnt even in the top 6 2:51 minutes earlier: (So this means that player was
playing offline making millions of pts (at least 6.8MM in the last 2:51 minutes of play)



80.     Defendants failed to disclose to Plaintiff that they would be competing against
offline users and that the leaderboard totals presented to them might be false or inaccurate.  This
failure induced Plaintiff to believe that they were performing better relative to other users than
they actually were.  This, in turn, caused Plaintiff to spend money on in-app purchases they
otherwise would not have spent had they known their true standing.

81.     Each and every one of Defendants' above-described misrepresentations and
omissions occurred every time Plaintiff viewed her scores on a leaderboard that (1)
misrepresented the number of competitors against whom Plaintiff were playing and her true
standing in the Tournament; (2) failed to disclose that other competitors in the Tournament were
cheating; (3) failed to disclose that other competitors in the Tournament were "Super Users"; and
(4) failed to disclose that other competitors in the Tournament were competing offline.

**C.  CAROL SMITH'S ORDEAL**

20

FILED DATE: 1/17/2025 3:33 PM    20251101791

82.     Plaintiff, Carol Smith, is a mother and grandmother who resides in Chicago, Illinois.

83.     Carol has been a regular player of Candy Crush for years. As a retired packer and line operator for the Solo Cup Company, Carol enjoyed filling her free time with playing Candy Crush.

84.     Carol was an avid Candy Crusher, usually playing at least six days a week for a couple hours. She was particularly attracted to the challenge and variety of the puzzles in the game.

85.     Carol would typically spend about $50 per month on the various in-app purchases, knowing what she was paying for and making a reasoned, *informed* decision to do so.

86.     All that changed when the Tournament began.

87.     Attracted by Defendants' in-game and televised advertisements detailing a share of $250,000 in prize money, an all-expenses-paid trip to London, and customized rings, Carol started playing in the initial qualifying round of the Tournament in March 2023.

88.     Carol was successful throughout the initial rounds. As she advanced, the competition got tougher, and Carol spent money on in-app purchases to keep up.

89.     But, enticed by Defendants' misrepresentations, Carol kept playing for hours and spent money at each stage in an attempt to keep advancing.

90.     After many days, Carol made it to the Final Knockout Round. If she placed first here, she would punch her ticket to the Live Finals in London.

91.     Initially, Carol played through the first game of the Final Knockout Round and did not notice anything particularly peculiar.

92.     However, Carol began to notice individuals scoring at a higher rate than what

21

FILED DATE: 1/17/2025 3:33 PM    20251101791

seemed humanly possible – adjudged from her own experience playing Candy Crush over the years.

93.     Carol stayed up through the night, losing sleep in a futile and impossible attempt to keep up with what she thought was a fair competition. In reality, due to Defendants' deceptive conduct, she never stood a chance.

94.     Unfortunately, Carol's investment did not pay off and she was eliminated from the Tournament.

95.     In total, Carol spent approximately $5,000 and over 50 hours on the Tournament, enticed by Defendants with the idea of winning cash and a trip to London playing what she had thought was a fair game.

96.     Had Carol known the true nature of the game, i.e., the existence of cheaters, Super Users, offline players, and misleading leaderboards, she would not have spent money on the in-app purchases during the Tournament.  Indeed, Carol would not have even played in the Tournament at all if she was aware of Defendants' deceptions.

97.     And perhaps we could blame Carol, and the millions of people like her who did the same, *if* the game had been fair.  We could say that adults should not allow themselves to be led astray by sleek corporate marketing and clever corporate machinations designed to draw players into a game where they need to spend their wages on color bombs and lollipop hammers. After all, if a corporation can convince people that they should exchange their money earned in the real world for intangible thingamajigs in the cyber world, then people have only themselves to blame.

98.     But whatever side of this debate one may choose to take, one point is beyond dispute: the game has to be fair and players must be given the information they need in order to

FILED DATE: 1/17/2025 3:33 PM    20251101791

make a reasoned, informed decision as to whether to spend their money on such items. And that's where things broke down.

99.    The game was anything but fair. As described in the foregoing sections, Defendants structured the Tournament into small groups with small leaderboards to mislead Carol into believing she was outperforming her competitors and had a reasonable chance of advancing to the Finals, when, in reality, she was playing against thousands or even millions of other users and had, at best, an infinitesimal chance of advancing. Additionally, Carol was competing against cheaters, Super Users and offline users, all of whom had an unfair advantage. Defendants knew this, but failed to prevent it, disclose it, or to actively address it. And they did so to maximize the in-app purchases of honest users, all of whom have been victimized by Defendants' conduct.

100.    Carol Smith brings this action seeking an order finding Defendants liable for (1) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, (2) fraud, and (3) unjust enrichment.

## COUNT I
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act

101.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Demand as though set forth fully herein.

102.    At all times relevant to this Demand, the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.* was in effect.

103.    ICFA, among other things, prohibits unfair or deceptive acts or practices, including, but not limited to, "misrepresentation or the concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission

23

of such material fact," or "the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act' (815 ILCS 505/2)," such as "conduct which . . . creates a likelihood of confusion or misunderstanding." 815 ILCS 510/2(12).

104.    At all times relevant hereto, Defendants were engaged in trade or commerce as defined under ICFA, 815 ILCS 505/1(f).

105.    Defendants engaged in deceptive acts and practices and conduct likely to cause confusion and misunderstanding when, in connection with the Tournament, Defendants knowingly, intentionally, and with intent to mislead, misrepresented to Plaintiff the number of competitors participating in and advancing to each stage of the Tournament, leading Plaintiff to believe she was outperforming the competition and had a reasonable chance of advancing in, and ultimately winning, the Tournament, when in fact, Plaintiff was competing against a significantly larger number of competitors.  On information and belief, Defendants made these misrepresentations intentionally to incentivize Plaintiff to continue playing in the Tournament, and spending money on in-app purchases during the Tournament, because had Plaintiff known her true standing, she would not have spent money on in-app purchases under the belief that she had a reasonable chance of winning a significant prize.

106.    Additionally, Defendants were aware that cheating was taking place during the Tournament, yet failed to disclose it to Plaintiff and did nothing to stop it.  Defendants were also aware that certain Super Users that had significant advantages were participating in the Tournament, but failed to either suspend Super Users' enhanced abilities during the Tournament, or disclose the existence of Super Users to Plaintiff or that Super Users would be permitted to use their enhanced abilities during the Tournament.  And Defendants permitted certain players to play "offline," obscuring their true performance in the Tournament, but failed to disclose to

24

FILED DATE: 1/17/2025 3:33 PM    20251101791

Plaintiff the existence and prevalence of such players.  On information and belief, Defendants

knowingly, intentionally, and with intent to mislead concealed this information from Plaintiff,

because if Plaintiff had been aware that cheaters, Super Users, and offline players were permitted

to compete without consequence, Plaintiff would not have entered or continued playing in the

Tournament and spent significant amounts of money on in-app purchases.

107.    Defendants' representations and omissions concerning the Tournament were

material to a reasonable consumer, were designed to affect consumer decisions and conduct, and

were likely to deceive and cause misunderstanding.  Plaintiff reasonably relied on Defendants'

material misrepresentations and omissions in deciding to participate in, and spending significant

amounts of time and money in, the Tournament.  Plaintiff would not have participated in the

Tournament and made extensive in-app purchases absent Defendants' false and misleading

representations and omissions.  At the very least, Plaintiff would have known exactly what she

was paying for.  Defendants robbed Plaintiff of this reasoned, informed choice.

108.    Defendants' conduct in this regard was unfair in that it violated public policy, was

immoral, unethical, oppressive, or unscrupulous, and caused substantial injury to consumers.

109.    As a direct and proximate result of the foregoing unfair, fraudulent and deceptive

acts and practices alleged herein, Plaintiff suffered actual damage when she devoted significant

time and effort to the Tournament, made extensive in-app purchases during the Tournament, and

provided Defendants substantial revenues, which she would not have absent Defendants' false

and misleading representations and omissions.

110.    Plaintiff is therefore entitled to relief, including actual damages, punitive

damages, costs and attorneys' fees, under section 815 ICLS 505/10a of ICFA, in an amount to be

determined at trial.

FILED DATE: 1/17/2025 3:33 PM    20251101791

## COUNT II
### Fraud

111.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Demand as though set forth fully herein.

112.    As set forth above, in connection with the Tournament, Defendants knowingly, intentionally, and with intent to mislead, misrepresented to Plaintiff the number of competitors participating in and advancing to each stage of the Tournament, leading Plaintiff to believe she was outperforming the competition and had a reasonable chance of advancing in, and ultimately winning, the Tournament when, in fact, Plaintiff was competing against a significantly larger number of competitors.  On information and belief, Defendants made these misrepresentations intentionally to incentivize Plaintiff to continue playing in the Tournament, and spend money on in-app purchases during the Tournament, because had Plaintiff known her true standing, she would not have spent money on in-app purchases under the belief that she had a reasonable chance of winning a significant prize.

113.    Additionally, Defendants were aware that cheating was taking place during the Tournament, yet failed to disclose it to Plaintiff and did nothing to stop it.  Defendants were also aware that certain Super Users that had significant advantages were participating in the Tournament, but failed to either suspend Super Users' enhanced abilities during the Tournament, or disclose to Plaintiff the existence of Super Users or that Super Users would be permitted to use their enhanced abilities during the Tournament.  And Defendants permitted certain players to play "offline," obscuring their true performance in the Tournament, but failed to disclose to Plaintiff the existence and prevalence of such players.  On information and belief, Defendants knowingly, intentionally, and with intent to mislead concealed this information from Plaintiff,

26

FILED DATE: 1/17/2025 3:33 PM    20251101791

because if Plaintiff had been aware that cheaters, Super Users, and offline players were permitted to compete without consequence, Plaintiff would not have entered or continued playing in the Tournament and spend significant amounts of money on in-app purchases.  Defendants had a duty to disclose this information, as Defendants' own actions created a misapprehension that the Tournament was fair, and Defendants deliberately failed to correct that misapprehension.

114.    Defendants' representations and omissions concerning the Tournament were material to a reasonable consumer and were designed to affect consumer decisions.  Plaintiff reasonably relied on Defendants' material misrepresentations and omissions in deciding to participate in, and spending significant amounts of time and money in, the Tournament.  Plaintiff would not have participated in the Tournament and made extensive in-app purchases absent Defendants' false and misleading representations and omissions.  At the very least, Plaintiff would have known exactly what she paid for.  Defendants robbed Plaintiff of this reasonable, informed choice.

115.    As a direct and proximate result of the foregoing representations and omissions alleged herein, Plaintiff suffered damages when she devoted significant time and effort to the Tournament, made extensive in-app purchases during the Tournament, and provided Defendants substantial revenues, which she would not have absent Defendants' false and misleading representations and omissions.

116.    Plaintiff seeks to recover the damages suffered, including actual and punitive damages, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT III
### Unjust Enrichment

117.    Plaintiff repeats and re-alleges the allegations contained in the preceding

FILED DATE: 1/17/2025 3:33 PM    20251101791

paragraphs of this Demand as though set forth fully herein.

118.    Through the unfair, fraudulent, and deceptive acts described herein, Defendants induced Plaintiff to expend significant amounts of time, effort, and money in connection with the Tournament, including the making of extensive in-app purchases in connection with the Tournament.

119.    On information and belief, Defendants were enriched to the tune of millions—if not tens of millions—of dollars as a result of Plaintiff's and others' participation in the Tournament and making of extensive in-app purchases during the Tournament.  Defendants retained these benefits to the detriment of Plaintiff.

120.    Under the circumstances, Defendants' retention of these benefits violates the fundamental principles of justice, equity, and good conscience.

121.    Plaintiff seeks to recover monetary damages and other relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

    a.   Find in favor of Plaintiff on all accounts asserted herein;

    b.   Award damages, including compensatory, statutory, and punitive damages to Plaintiff in an amount to be determined at trial;

    c.   Grant restitution to Plaintiff and require Defendants to disgorge their ill-gotten benefits;

    d.   Award Plaintiff reasonable attorneys' fees and the costs and disbursements of this suit incurred herein;

    e.   Award Plaintiff pre-judgement and post-judgment interest at the highest legal rate to the extent provided by law;

FILED DATE: 1/17/2025 3:33 PM    20251101791

f.  Order any such other and further relief the Court deems just and equitable.

## **JURY DEMAND**

Pursuant to Illinois Supreme Court Rule 285, Plaintiff demands a trial by jury of twelve (12) on all counts herein and of all issues so triable.

FILED DATE: 1/17/2025 3:33 PM    20251101791

Dated: January 17, 2025

Respectfully submitted,

*/s/ Akshay Soman*

Martin W. Jaszczuk
Margaret M. Schuchardt
Akshay Soman
**JASZCZUK P.C.**
311 S. Wacker Drive, Suite 2150
Chicago, Illinois 60606
Telephone: (312) 442-0509
Facsimile: (312) 442-0519
mjaszczuk@jaszczuk.com
mschuchardt@jaszczuk.com
asoman@jaszczuk.com

*Attorneys for Plaintiff*

30